STATE OF IOWA ex rel. J. B. WEEDE, Plaintiff-Appellee, v. MARTHA R. BECHTEL et al., Appellants, GEORGE M. BECHTEL, Executor, substitute Appellant, IOWA SOUTHERN UTILITIES COMPANY OF DELAWARE et al., Defendants-Appellees, and ILA FAYE THATCHER et al., Intervenors-Appellees.

No. 46686.

(Reported in 31 N. W. 2d 853)

April 6, 1948.

Rehearing Denied November 19, 1948.

Cross & Hamill, of Newton, and Cook, MacLaughlin, Blair & Balluff, of Davenport, for appellants.

Havner & Powers, of Des Moines, F. A. Ontjes, of Mason City, and V. H. Morgan, of Newton, for plaintiff-appellee and intervenors-appellees.

1300

Valentine & Valentine, of Centerville, Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, and Cook, MacLaughlin, Blair & Balluff, of Davenport, for defendants-appellees.

Lane & Waterman, of Davenport, for Celia Carson and Davenport Bank & Trust Company, defendants-appellees.

MANTZ, J.—The action is in equity. Plaintiff, State of Iowa ex rel. J. B. Weede, brought suit against various parties, including the Iowa Southern Utilities Company of Delaware, Martha R. Bechtel, George M. Bechtel, Harold R. Bechtel, et al. The action was instituted under the provisions of chapter 387, Code of 1935 (chapter 495, Code of 1946), and in its petition plaintiff claims that in various transactions, beginning about the year 1916 and continuing down to the time the petition was filed, the Iowa Southern Utilities Company, together with George M. Bechtel and his interests, conducted the affairs of said Utility Company in an illegal and unlawful manner and in violation of the statutes of Iowa. Plaintiff prayed that the court determine the stock entitled to be recognized as having voting rights in stockholders' meeting; that the officers be restrained from further illegal action in connection with the defendant Utility Company; that said corporation be dissolved and a receiver be appointed to wind up its affairs, and for general equitable relief. This claim of plaintiff was denied by said defendants who alleged that all of such proceedings were in accord, not only with the laws of Delaware, but those of the State of Iowa.

Following the filing of the petition, various motions to strike were directed towards plaintiff's petition. These motions were ruled upon by the trial court and certain parts of such petition were ordered stricken. Following this, a motion to dismiss containing eighteen separate grounds was filed. This motion to dismiss was sustained generally and without specification upon the particular ground. Plaintiff appealed to this court and this court reversed the action of the trial court. (State ex rel. Weede v. Iowa Southern Utilities Co., 231 Iowa 784, 2 N. W. 2d 372, 4 N. W. 2d 869.)

Following the filing of the opinion of this court said cause was remanded to the lower court for trial upon the merits.

In the concluding paragraph of that opinion this court said: "The relief to which the appellant [plaintiff herein] may be entitled will necessarily depend upon the facts established by the evidence." Page 840 of 231 Iowa, page 401 of 2 N. W. 2d.

We will briefly outline the proceedings in the cause following the filing of the opinion mentioned above.

Following remand, plaintiff's petition was amended in various particulars. On February 15, 1940, Ila Faye Thatcher and Nancy Rosseau filed a pleading denominated by them as intervening answer. This they later amended admitting the allegations of plaintiff's petition except as to the invalidity of the stock held by the intervenors in the Iowa Southern Utilities Company. On February 12, 1943, there was filed by defendants Celia Carson, executrix of the estate of George S. Carson, deceased, and the Davenport Bank & Trust Company, trustee under the will of George S. Carson, an answer to the petition of plaintiff. On February 25, 1943, said defendants filed an amended and substituted answer to plaintiff's petition. On February 13, 1943, there was filed by the defendant Iowa Southern Utilities Company of Delaware an answer to plaintiff's petition. On February 15, 1943, the defendants Martha R. Bechtel, George M. Bechtel, Harold R. Bechtel, Edward L. Shutts, H. W. Deininger, D. D. Bentzinger, M. G. Stover, and Charles Westbrook, filed a separate answer to plaintiff's petition. On March 1, 1943, the defendant Elery Scott filed a substituted answer appearing in said answer pro se.

On March 5, 1943, plaintiff filed a reply to the separate answer of the Iowa Southern Utilities Company, and on March 6, 1943, plaintiff filed a reply to the answer of Martha R. Bechtel, George M. Bechtel, Harold R. Bechtel, Edward L. Shutts, H. W. Deininger, D. D. Bentzinger, M. G. Stover, and Charles Westbrook.

On December 28, 1943 following trial, plaintiff filed an amendment to petition to conform pleading to proof. To this amendment the defendants filed answer and on January 10, 1944, plaintiff filed a reply to the answer of defendants to plaintiff's amendment to conform pleading to proof.

Briefly speaking, all of the answering defendants save Elery Scott pleaded specifically to the petition of the plaintiff.

Said petition is set forth in the opinion in the former appeal. (231 Iowa 784, 2 N. W. 2d 372, 4 N. W. 2d 869.) Certain parts of said petition are admitted particularly with reference to the organization of the Iowa Southern Utilities Company, its location, business and purposes; the acquisition of other property; the issuance of stock under the terms of its charter, denying fraud, or illegality in organization or conduct and alleging full compliance with the laws of Delaware and those of Iowa. By separate answers the Bechtels plead substantially along the same line as the Utility Company, deny any fraud or illegal action and plead full conformance to the statutes of Delaware in the issuance of stock and claim to be full owners of stock in said company as good faith holders thereof.

Defendants representing the estate of George S. Carson and the trustee under his will filed pleading along the same lines as those filed by the Utility Company and the Bechtels.

This court appointed Honorable HENRY N. GRAVEN, District Judge, to conduct the trial of said case. The record shows that the trial took approximately five months. On January 20, 1944, the trial court entered a finding of fact and conclusions of law and held therein that the 39,468 shares of new common stock issued in August 1938 to Martha R. Bechtel in exchange for 100,000 shares of non-par common stock were void, invalid and of no force and effect and were not entitled to participate as valid shares in the control or management of the Iowa Southern Utilities Company of Delaware. Said decree found adversely to plaintiff on all other claims set forth in its petition.

I. Both plaintiff and the Bechtels (defendants) have appealed. The latter, having first given notice of such appeal, will be designated as appellants, while the plaintiff will be designated as appellee. As there are two appeals herein it will be necessary to keep in mind the situation and position of the parties appealing in giving consideration to the various questions and claims advanced by such parties.

The Iowa Southern Utilities Company of Delaware, defendant, has not appealed, and in this opinion we will refer to said defendant as the Utility Company. While not appealing, said Utility Company has filed herein a brief and argument wherein

it seeks to sustain the holding of the trial court so far as same is favorable to its claims.

Briefs and arguments have been filed on behalf of the plaintiff-appellee, also on behalf of Ila Faye Thatcher and Nancy Rosseau, intervenors, and also by Elery Scott who appeared pro se and designates himself as defendant cross-petitioner.

II. The main controversy seems centered around the Utility Company, a Delaware corporation, its organization, structure, control, and activities since its organization in Delaware February 12, 1923. Prior to that time it had operated as a foreign corporation of the State of Maine for a number of years. When it was organized under the laws of Delaware it took over the property of the Maine corporation. Following its organization as a Delaware corporation, it applied for and received a permit from the proper officials of Iowa to conduct business within the State of Iowa. This permit was later renewed and was in effect when this case was tried.

As above set forth, the action designated as plaintiff, State of Iowa ex rel. J. B. Weede. The action was instituted pursuant to the provisions of section 8438, chapter 387, Code of 1935 (section 495.6, chapter 495, Code of 1946).

In the former appeal some question was raised as to the jurisdiction of the court to try the issues raised in the petition. In the opinion filed in that appeal it was held that the court had jurisdiction to try said issues. Appellants argue that as the action is one in the nature of quo warranto the relief sought and granted appellee cannot be sustained. Assuming that the point was properly raised, still we see no merit therein. Above, we have indicated the statute under which the action was properly brought.

III. The record is large. The issues and the evidence offered in support thereof cover a wide range. A very considerable part of the evidence was given by experts—those engaged in corporation affairs, their organization, the financing thereof, the issuance and disposal of corporation securities, and public accountants.

In the consideration of the questions presented we shall endeavor to confine this opinion, so far as possible, to the essential points involved and necessary to a disposition of such ques-

tions. In so doing, we will, to a considerable extent, deviate from the method used by the respective parties.

While many points are set forth and argued, still we think the controlling and decisive questions are rather limited. Quite often in written briefs the arguments made upon some certain point or proposition are made applicable to other points, this being done by reference. Arguments set out in such a manner are at times somewhat confusing.

The opinion in the former appeal is found in 231 Iowa 784, 2 N. W. 2d 372. Said opinion was written by Justice BLISS, now a member of this court. In said opinion, on pages 787 to 799, inclusive, pages 376 to 382 of 2 N. W. 2d, there is set forth a clear and concise statement of the nature of the case, the parties, the petition, a statement of the allegations thereof, the relief sought, and certain statutes claimed to be applicable thereto. For such matters see that part of said opinion. The pleadings of the various parties subsequent to said opinion have been hereinbefore set forth.

IV. The appellants' appeal involves the validity of the action of the Utility Company in amending its articles of incorporation and adopting a plan to reclassify its stock as of August 1, 1938. The Utility Company is a foreign corporation, first organized under the laws of Maine, about 1916, and later, on February 12, 1923, reorganized and incorporated under the laws of the State of Delaware. At that time it took over the property and assumed the obligations of the Maine corporation. Aside from some bank accounts, all of its property is and has been located in Iowa where it operated as a Utility Company, being engaged principally in the manufacture and distribution of electrical energy, gas, steam, light, heat, power, and other facilities.

At the time of the trial below this Utility Company was serving approximately one hundred fifty communities within the State of Iowa. During all times material, it had a permit from the State of Iowa authorizing it to carry on its business within the State of Iowa as a foreign corporation. This permit was issued to it on March 26, 1923. Said permit stated that same was issued pursuant to the statutory provisions of the State of Iowa. A like permit was later issued at the expiration of the one

secured in 1923 and this renewed permit was in full force and effect at the time the case was instituted in the lower court.

The record shows that at various times applications were made to the proper officials of the State of Iowa for authority to issue stock for the purposes of sale or to pay for property acquired. Authority to do so was granted and reports as to stock so issued were given to the proper officials of Iowa.

On August 1, 1938, a special meeting of the stockholders was held at Davenport, Iowa.

For several years prior to said time, the company had been involved in financial difficulties. Its funded debt as of December 1932 totaled $16,214,000, divided into seventeen different issues, a great many of which were of short maturity and bore a high interest rate. On August 1, 1938, there were 80,102 shares of cumulative preferred stock outstanding of a par value of $8,010,200, with unpaid dividends on such stock in the sum of $2,442,102.36. The annual reports of the Utility Company showed its impaired financial condition. The meeting of August 1, 1938 was a special one and was called to take some action with regard to the finances of the company. A majority of the outstanding stock was represented at such meeting. A great majority of the preferred stockholders appeared by proxies. The record shows that the officers of the Utility Company, for some time prior to such August meeting, had pursued a rather active campaign to secure proxies for such meeting. Stockholders were solicited to send in proxies. We are of the opinion that in some respects the holders of the preferred shares, whose proxies were solicited and secured, were not fully and fairly informed of the nature, plan, or of the probable effect upon the value of the stock held by them in the proposed plan of refinancing the capital structure of the company and the reclassification of its stock.

At that time there were outstanding three classes of preferred stock totaling 80,102 shares, all of which stock had dividend arrears. These shares, by their express terms, were prior to any of the common stock then outstanding, with respect to the property of the corporation. This preferred stock was divided as follows: 49,660 bearing seven per cent, 3893 bearing six and one-half per cent, and 26,549 bearing six per cent. In addition there were outstanding 100,000 shares of no-par common

stock. This common stock then belonged to Martha R. Bechtel, or the Bechtel interests. This block of stock had been accumulating for a number of years and to a considerable extent grew out of some of the various transactions whereby the Utility Company acquired certain properties through dealing with George M. Bechtel. At such meeting an amendment to the articles of incorporation of said Utility Company was adopted. This new plan for the reclassification and reissue of the various classes of stock outstanding had been formulated and proposed by a com-. mittee of two appointed from and by the board of directors. Among other things, the amendment provided that the Utility. Company stock would be changed from 250,000 shares (150,000 of cumulative preferred and 100,000 of no-par common stock) to 360,000 shares of one class of common stock of the par value of $15 each. The net result of this new plan was to retire the cumulative preferred shares together with the common stock then outstanding, and to issue in lieu thereof one class of.common stock. The proceedings adopted at such meeting by the board of directors and later confirmed by the stockholders, authorized and directed the officers of the Utility Company to carry out said plan—to retire both the preferred and common stock and to issue in exchange therefor, at a fixed ratio, new common stock. It was further provided that when preferred stock was surrendered for the new common stock there should be issued with each share arrear dividend certificates.

Under the amendment it was provided that the outstanding capital stock should be reclassified so that the shares of cumulative preferred stock outstanding should become shares of common stock in the ratio of 4.2 shares of new common stock for each share of the 49,660 shares of the cumulative preferred stock of the seven per cent series outstanding; 3.9 shares for each share of the 3893 shares of six and one-half per cent outstanding; and 3.6 shares for each share of the 26,549 shares of six per cent series outstanding, so that each share of common stock outstanding should become .39468 shares of the new common stock.

It will appear that under the plan of reclassification the 100,000 shares of Bechtel stock were entitled to receive 39,468 shares of the new common stock. Further, such reclassification

plan provided that upon the surrender of the cumulative preferred shares, the new shares of common stock would issue to the holders thereof in the ratio as set forth above and in addition such holder would be entitled to be paid arrear certificates to satisfy dividends then unpaid on such preferred stock. Under this plan a large number of the shares of preferred stock were turned in and new common stock issued. However, in order for a holder of preferred stock to secure such dividend arrears he had to surrender the stock held by him.

Under this plan it appears that the 39,468 shares issued in lieu of the 100,000 shares held by Martha R. Bechtel were placed on a parity with all of the new shares of common stock save that such shares did not participate in the arrear dividends. They were likewise given a value of $15 per share along with the other new common stock.

Appellee charged that such plan of reclassification so far as the issuance of the 39,468 shares was concerned was illegal and unlawful in that it violated the provisions of chapter 387, Code of 1935. Appellee contended below and contends here that at the time of such reclassification in August 1938 the 100,000 shares of stock held by the Bechtels were of no value—in fact were worthless—and that to reissue such stock under the new plan was a fraud at law upon the preferred stock.

As before stated, Martha R. Bechtel on August 1, 1938 was the owner of 100,000 shares of common stock then outstanding. The evidence shows that her interests in the Utility Company were handled either by her husband, George M. Bechtel, or her son, Harold R. Bechtel. She took no part in the activities of said company. As a witness she so testified.

The record shows that the new plan of reclassification of the stock had been contemplated for some months prior to the August meeting. At various meetings held, the records show that George M. Bechtel was an officer in the Utility Company and took an active part in the control and management of its affairs. He was a director therein and usually acted as chairman of the board. Harold R. Bechtel was a member of the board of directors and usually acted as its secretary. At the annual directors' meeting in 1936, George M. Bechtel was chairman and Harold R. Bechtel, secretary; the same was true in 1937. At the direc-

tors' meeting of 1937 held in Chicago, a committee consisting of H. R. Bechtel and Dawson Brande was appointed to formulate a plan of recapitalization and submit it to the board of directors within thirty days from date (April 17, 1937). On February 12, 1938, the board met in Chicago. George M. Bechtel was chairman and H. R. Bechtel, secretary. At that time the new plan of recapitalization was presented and considered. At the annual meeting of the company held at Davenport, Iowa, on April 18, 1938, there were represented 129,119 shares of stock; 2612 being in person and 126,507 by proxies. Again George M. Bechtel was named chairman of board and H. R. Bechtel, secretary, at the annual directors' meeting held later on the same day.

On June 10, 1938, a board meeting was had in Chicago. George M. Bechtel presided as chairman and H. R. Bechtel was secretary. At that meeting of the board a resolution to amend the articles of the corporation and to adopt the new plan of reclassification of the stock of the company was unanimously adopted. At that time the special stockholders' meeting was called for August 1, 1938, at which meeting said reclassification was adopted. It is somewhat significant that the form of proxy sent out for the August 1, 1938 meeting contained a provision that the proxies Edward L. Shutts, Dawson Brande, and Edward de Rivera, all members of the board, could not vote any way except for the proposed amendment.

V. The specific claim which the appellee makes in regard to this particular transaction is that it violates section 8412, Code of 1935, which in substance states that no corporation organized under the laws of this state, except building and loan associations, can issue shares of capital stock until the corporation has received par therefor, and in the following section (8413) it is provided that if anything other than money was proposed, permission to accept must be obtained from the Executive Council upon application setting out the facts of the proposition. These provisions are made applicable to foreign public utility corporations by section 8433, Code of 1935 (section 495.1, Code of 1946).

Briefly, appellee claimed that the exchange of worthless stock held by Martha R. Bechtel violated the letter and spirit

of the above-mentioned statute; that it was unfair and inequitable to the other holders of preferred shares and particularly to intervenors; and this being true, the stock issued under the statute was void and without standing in the operation or control of the Utility Company. Appellee relies upon the holding of this court in the prior appeal as sustaining such claim (231 Iowa 784, 2 N. W. 2d 372) and also upon general equitable principles.

VI. In order to determine the effect of our holding on the former appeal, we think it advisable to examine the situation which was presented to the court on such appeal as shown by the opinion filed on the tenth day of February, 1942. As heretofore stated, an appeal was taken from the ruling of the trial court wherein the court sustained a motion to dismiss the plaintiff's petition. On appeal the ruling of the trial court was reversed and the cause remanded for trial upon the merits. The ruling of this court is set forth on page 840 of 231 Iowa, page 400 of 2 N. W. 2d, and we deem it advisable to set forth parts of the concluding paragraph thereof:

"No inferences are to be drawn respecting the merits of the case from anything we have said herein. We are simply holding that the plaintiff was, and is, entitled under the allegations of its petition to a trial on the merits. The appellee has asked us to decide important questions, including the finding that legislative enactments of long standing are contrary to both the Constitution of the United States and of Iowa. Such questions ought ordinarily, if possible, be presented to a court after a full hearing on both the facts and the law. Anderson v. Jester, 206 Iowa 452, 464, 221 N. W. 354. All questions presented have been carefully considered and passed upon, and we believe, correctly. The relief to which the appellant may be entitled will necessarily depend upon the facts established by the evidence. If other parties are necessary to grant full relief, the trial court may bring them in or they may intervene. The court, by the last lines of section 8438, is authorized and directed to protect all rights possessed by those holding capital stock of the appellee not in violation of chapter 387."

From the above it will be noted that this court in such

former opinion held that the petition was sufficient to entitle plaintiff to a trial upon the merits; and that whatever relief plaintiff would be entitled to would necessarily depend upon the evidence. There was likewise the direction as a court of equity that protection should be given to all holders of capital stock in the appellee corporation not held in violation of chapter 387, Code of 1939.

The petition as it stood when the motion to dismiss was sustained set out the various steps taken in the various stock issues and transactions of the Utility Company from the time it was organized as a Maine corporation down to the time when the action was instituted. It set forth in detail the various steps taken leading up to, at, and following the reclassification of stock as of August 1938. Plaintiff's petition alleged that in such reclassification there was contemplated the surrender of all classes of stock outstanding, and its reissue in one class, to wit, common stock. Under such plan preferred stock was to be exchanged at a fixed ratio for new common stock and the 100,000 shares of Bechtel stock were to be exchanged for new common stock at a determined ratio and with a value of $15 per share.

The whole plan simply provided for the exchange of old stock for the new common stock. The Bechtels and the Utility Company refer to the whole transaction as a "reissue" of stock. At times they refer to the transaction as being a "reclassification." Appellee in argument calls the new plan a "reorganization." We do not regard the name used as significant. Summed up, it contemplated retiring all the old stock, both preferred and common, and exchanging same for new common stock.

The petition made special and specific attack upon that part of said plan involving the exchange of Bechtel stock. In the prayer of plaintiff's petition, we find among other things, the following:

"* * * that the court determine what stock issued by the Utility Company was valid and what outstanding was entitled to voting rights, and that the court determine the validity of the rights of the Bechtels in and to the stock issued in exchange for the 100,000 shares of old common stock."

The issues therein raised were tried, following which Judge

GRAVEN in finding and decree sustained the prayer of plaintiff's petition as above set forth. As showing the basis of his finding and decree, we quote parts thereof:

"The court finds that the said reclassification as to the issuance of 39,468 shares issued to Martha R. Bechtel, that the reclassification plan so far as it provided for and permitted the issuance of 39,468 shares to the said trustees of Martha R. Bechtel *was unjust and unfair and inequitable as to the former preferred stockholders represented in this case by the intervenors, Ila Faye Thatcher and Nancy Rosseau.* * * * That the stock provided for in the reclassification of August 3, 1938, as to the number of shares to be issued in lieu of the cumulative preferred stock was, as between the preferred stockholders a fair, just and equitable distribution as to the stock to be issued to the respective series of cumulative preferred stock in lieu of the former cumulative preferred stock. [Italics supplied.]

"That on August 1, 1938, prior to the meeting for the reclassification of the stock, there was issued and outstanding 80,102 shares of cumulative preferred stock of the par value of $8,010,200. That there was due and unpaid accumulative dividends on the same in the sum of $2,442,102.36. That this preferred stock under the articles of incorporation of the corporation had priority and preference to the full extent of its par value and accrued dividends thereon over the existing no-par common stock. That on August 1, 1938, prior to said reclassification, the net assets of the corporation were such as to lack several million dollars of being equal to the par value of the preferred stock and the accumulated dividends thereon. That the said no-par common stock immediately prior to said reclassification was wholly worthless. That under the reclassification plan there was issued in lieu of said no-par common stock 39,468 shares of new common stock, with a par value of $15 per share, which except as to the matter of accrued dividends was placed on an equality with the shares of new common stock issued to the former preferred stockholders. *That the no-par common stock for which the new common stock was issued, was worthless, and that there was no consideration for the issuance of the said 39,468 shares of new common stock.*" (Italics supplied.)

1312

With reference to such 39,468 shares of new common stock the court by decree provided:

"It is further adjudged and decreed that the 39,468 shares of new common stock into which the old common stock was transmuted is *void and invalid, and shall not be recognized by the corporation as being stock of the corporation, and shall not be reinstated as to its former position of no-par common stock.* That the new common stock into which the former cumulative preferred stock was transmuted constitutes and is valid stock of the corporation." (Italics supplied.)

As bearing on the attitude of the trial court on the question of the validity of the shares of new common stock obtained by the Bechtels out of the reclassification of August 1, 1938, we desire to set forth additional parts of the record. The taking of evidence was completed on January 6, 1944, and time was fixed for oral arguments. These oral arguments lasted several days, being concluded on January 13, 1944. On January 19, the trial judge from the bench in open court gave a detailed oral finding in which the various issues and evidence introduced were discussed. In speaking of the meeting of the Utility Company of August 1, 1938, wherein there was a reclassification of the new stock of the Utility Company, the court said:

"Now just prior to the meeting they had eight million dollars worth of stock, preferred stock outstanding, which was entitled to full preference ahead of the common stock; they had around two million back dividends outstanding, which was ahead of the common stock, and yet in the meeting of August 1, 1938, the assets of the company were not sufficient to pay much more than half of the preferred stock, so this common stock belonging to the Bechtels was absolutely worthless, yet in the reclassification meeting of August 1, 1938, this worthless common stock was changed over so that on the first of August, 1938, the Bechtels, instead of having one hundred thousand shares of no-par common stock, absolutely worthless, they own six hundred thousand dollars of new common stock, fifteen dollars par value, on a par with the old preferred. In other words I regard that as taking six hundred thousand dollars out of the pockets

of these preferred stockholders. They are given thirty-nine thousand shares, and they are put on a par with the preferred stockholders. Now that transaction of August 1, 1938, so far as the Bechtels are concerned, must meet my condemnation."

We have gone over the record and hold that the evidence therein fully supports the above finding.

It will be observed that the trial court held that the method used by the Utility Company in reissuing the Bechtel stock was to be condemned as violating equitable principles; that to sustain it would be inequitable to others who then had preferred stock. It has been held that a stockholder whose rights in and to his holdings in a corporation are being jeopardized may resort to equity to protect his rights. 13 Am. Jur., Corporations, 312, section 193. See Luther v. C. J. Luther Co., 118 Wis. 112, 94 N. W. 69, 99 Am. St. Rep. 977; Glenn v. Kittanning Brewing Co., 259 Pa. 510, 103 A. 340, L. R. A. 1918D, 738, Ann. Cas. 1918D, 769.

As to the power of a court of equity to cancel stock illegally or fraudulently issued at a suit of a stockholder see 18 C. J. S., Corporations, section 249; Axford v. Western Syndicate Inv. Co., 141 Minn. 412, 170 N. W. 587; Hammer v. Cash, 172 Wis. 185, 178 N. W. 465; Pontiac Packing Co. v. Hancock, 257 Mich. 45, 241 N. W. 268; Copper King Mining Co. v. Hanson, 52 Utah 605, 176 P. 623; 14 C. J., Corporations, 463, note 77. In discussing the powers of courts of equity we think the language of the text by that profound jurist, Story, in 1 Story's Equity Jurisprudence, Fourteenth Ed., 96, section 95, is peculiarly applicable to the present situation:

"Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief."

Applying the above statement to the situation in the instant

case the beneficent result afforded by the decree of Judge GRAVEN was to restore to the preferred shares their rights as they existed prior to the plan adopted as of August 1938. Further, it imposed no illegal burden upon the Bechtel stock. What Mrs. Bechtel had before that date was worthless. The decree added nothing to the burden of such old stock. No doubt the trial court had in mind that most wholesome equitable maxim, "Equity suffers no wrong to be done without a remedy." See 1 Pomeroy's Equity Jurisprudence, Fifth Ed., section 35 et seq.

VII. The appellants, together with the Utility Company, have argued at length that the trial court had no jurisdiction to enter a decree declaring as void and with no power or right to participate in the control or management of the Utility Company, the 39,468 shares of stock issued to Martha R. Bechtel out of the August 1, 1938 reclassification of the stock in the Utility Company. They make the claim that, strictly speaking, the issue as to the invalidity of such stock was not properly before the court; that the parties properly in court did not litigate that issue; that some of the parties making such claim were not before the court and did not participate in the proceedings; and hence the finding of the court that the classification plan as adopted by the Utility Company as to intervenors Thatcher and Rosseau was error in that they did not appear or raise such issue.

An examination of the record does not sustain such claim on behalf of the Bechtels or of the Utility Company. In the first place plaintiff-appellee definitely and specifically attacked the method and procedure adopted and followed by the Utility Company leading up to the plan which was adopted as of August 1, 1938. They specifically alleged that what was done at said time was illegal and unlawful and discriminated against the holders of preferred stock and resulted in giving value to 100,000 shares of worthless stock held by Martha R. Bechtel, to the prejudice of stock having priority as to assets and dividends. Said petition definitely alleged that on August 1, 1938, the said shares of Bechtel common stock were worthless and of no value and that the plan resulted in the exchange of such worthless stock for 39,468 shares of new stock at the par value

of $15 per share and on an equal basis of the old and retired preferred stock except as to dividend arrears due on the old preferred stock.

To determine whether or not there was an issue on said matter we will consult the record. Paragraph 47 of plaintiff-appellee's petition sets forth that on August 1, 1938, a stockholders' meeting of the Utility Company was held at Davenport, Iowa, for the purpose of considering a plan of recapitalization of all its stock, preferred as well as common, and that such stock be canceled and in lieu thereof there be issued common stock on the following basis:

"For each share of 7% preferred stock the holder should receive a dividend certificate for $32.08 and 4.2 shares of new common stock for each share of the old stock held; the 6½% preferred stock—the holder to receive a dividend arrears certificate of $29.79 and 4.9 shares of new common stock for each share held; that holders of the 6% preferred stock should receive a dividend arrears certificate of $27.50 and 3.6 shares of new common stock for each share of old stock held; each holder of common stock to receive 39468/100,000 share of new common stock for each share of old common stock held."

Appellee alleges that said plan was adopted. Paragraph 49 of appellee's petition is as follows:

"That the exchange of the different classes of preferred stock for common stock and the exchange of the existing common stock for common stock on the basis hereinbefore set out, was all an arbitrary basis fixed by a committee composed, in part, of members of the Board of Directors of the Iowa Southern Utilities Company of Delaware, and, in part, of parties outside of the Board of Directors; that said exchange value was fixed without reference to the legal rights of any of the stockholders; that at the time said basis of exchange was fixed, the officers and directors of said defendant corporation knew that a large part of the preferred stock had been issued without the full par value having been paid therefor, and knew that the 100,000 shares of common stock was worthless and without value, and knew that said corporation had never received any value for

said 100,000 shares of common stock so issued; that the officers have never secured from the Executive Council of the State of Iowa any authority for the issuance of the new so-called common stock, and said officers have issued and are issuing the new common stock in violation of the laws of the State of Iowa, and such stock is being issued without having first secured the approval or authority of the Executive Council of the State of Iowa."

The answer of appellants denies that the 100,000 shares of stock held by appellants on August 1, 1938 were worthless and of no value. We quote a part of the appellants' answer:

"They likewise deny that the corporation had never received anything of value for the 100,000 shares of outstanding common stock. They deny that said 100,000 shares of common stock were worthless and without value, but aver that if this were so the fact is wholly immaterial."

Substantially a like answer was made by the Utility Company.

According to the record, Ila Faye Thatcher and Nancy Rosseau on February 15, 1940 filed what was denominated an intervening answer. This was later amended. Therein said intervenors pleaded ownership of preferred stock acquired by paying cash therefor. In effect they adopted the allegations of the petition of plaintiff and prayed the court to determine the voting rights of the respective shares of stock as prayed for by plaintiff (appellee); that the court decree that any preferred stock found to be void be not entitled to vote at any of the corporate meetings; that any stock for which full value had not been paid in cash have no voting rights; and likewise no other stock illegally issued have any voting rights as of August 1, 1938.

To this intervening answer of Ila Faye Thatcher and Nancy Rosseau a motion by the Utility Company to strike was overruled. We do not find in the record that any answer or denial to said intervening answer was filed thereafter. One of the defendants, Elery Scott, filed a substituted answer wherein he alleged that he had previously owned preferred stock in the Utility Company; that by reason of certain false statements and representations made to him by various agents of the Utility

Company he was induced to exchange same for a part of the new common stock issued by such Utility Company; that at the time of the reclassification of the stock the common stock was worthless and subservient in all ways to the preferred stock, both as to assets and dividends. Said defendant alleged that the new common stock held by him was void and that he was entitled to a return of his preferred stock; prayed that the court determine the voting rights of the respective shares of preferred stock as prayed by plaintiff; that the court decree illegally issued stock void ab initio and also that any preferred stock for which full value was not paid in cash be held to have no voting rights as of August 1, 1938. Said defendant Scott prayed that a receiver be appointed as prayed by plaintiff and for further equitable relief. We do not find in the record any pleading attacking or denying such answer.

The record shows affirmatively that the appellants as well as the Utility Company specifically and definitely controverted the claim of appellee that the reclassification plan of August 1, 1938 was illegal and unlawful or that the Bechtel stock of 100,000 shares was worthless at said time. The record shows that the question as to whether the 100,000 shares of Martha R. Bechtel were worthless on August 1, 1938 was definitely an issue and the record shows affirmatively that much evidence was offered bearing on that question. The Bechtels and the Utility Company, having joined issue on this matter and having introduced evidence, are not in a position to urge that it was not an issue and was not litigated.

We agree with the finding of the trial court as bearing on the question as to the assets of the Utility Company when the reclassification was made on August 1, 1938. There were introduced the various records and reports of the Utility Company dealing with the property of said Utility Company, its value, and its obligations. The record is rather long and involved. To set out an analysis of the complicated and involved figures showing assets, outstanding obligations, and stock liability would serve no useful purpose.

As bearing on the question of the value of the common stock of the Utility Company we have examined the minute book of such company. At a meeting of the board of directors of said

company, held some months prior to the reclassification of August 1938, the matter of the financial condition of the Utility Company was being discussed—the matter of the earnings, unpaid dividends, rates, etc. E. F. Bulman was then president and treasurer of such Utility Company. He reported to the board of directors on various financial matters. Therein he stated as to the common stock, as follows:

"It is difficult to accurately determine the value of the present Common Stock of this Company, either from the Company's Earnings Statement or Balance Sheet. With the Company's earnings insufficient to cover full Preferred dividends at the present time and an accumulation of dividends amounting to $1,862,764. to be paid before the Common Stock will again participate in the Company's earnings, it is hard to forecast when dividends can be resumed again on our Common Stock. This is especially true, considering that some cash for capital expenditure in the future will have to come from the Company's income in excess of our present rate of retirement reserve so that from an earning standpoint, for the next ten years it has an indeterminate value. On the basis of the Balance Sheet it has no value because of intangible items making up our Balance Sheet assets and the amount of senior securities outstanding which are not even fully covered by our fixed and current assets."

Doubtless the trial court had before it the statement above quoted and taken from the records of the Utility Company.

We see no merit to the claim of appellants that there was no issue on the value of the 100,000 shares of common stock and later reissued or reclassified as 39,486 shares of new common stock.

VII(a). Appellants in argument state that the intervenors Thatcher and Rosseau were in default by not being present at the time of the trial. We have examined the transcript and do not find that it bears out this claim. Certainly it was not insisted upon at the time of the trial. The record shows that Elery Scott appeared pro se. Also that Clark, Pryor, Hale & Plock appeared for the answering intervenors. The trial court did not consider

intervenors in default. Such appearances are shown at the very beginning of the trial court's findings of fact.

The record does not show the daily attendance of the various interested parties. It may be that some of the litigants were not present all of the time. However, the record shows that all those who appeared were represented by counsel, save and except the defendant Elery Scott, who appeared pro se. In a trial lasting about five months it would not be surprising if at times some of the parties were absent. We find no merit to such claim.

VIII. Concerning the claim of the appellants and the Utility Company that the reclassification or reorganization of the stock structure of the Utility Company was not governed by the statutes of Iowa, but that the laws of Delaware governed, we call attention to the fact that the same issue was decided adversely to the Utility Company in the case of State ex rel. Weede v. Iowa Southern Util. Co., 231 Iowa 784, 2 N. W. 2d 372, supra. In Division III of said opinion (pages 806–828) there is an extended discussion of the right of a foreign corporation to do business in the State of Iowa. There will be found numerous cases from most of the jurisdictions, state and federal, dealing directly with this subject. We have examined the cases there cited and are of the opinion that such fully sustain the holding of the court. We do not think it necessary to add thereto. However, we desire to set forth a quotation from the case of German-American Coffee Co. v. Diehl, 216 N. Y. 57, 63, 109 N. E. 875, 876, wherein the eminent Justice CARDOZO, speaking for the court said:

"As long as a foreign corporation keeps away from this state, it is not for us to say what it may do or not do. But when it comes into this state, and transacts its business here, it must yield obedience to our laws. (Sinnott v. Hanan, 214 N. Y. 454, 458 [108 N. E. 858].) For many purposes the fiction of its residence in the state of its origin must then be disregarded. [Citing cases.] This statute makes no attempt to regulate foreign corporations while they keep within their domicile. It is aimed against them only while they elect to live within our borders. The duty which it imposes arises only when they come to us, and ends the moment that they leave us. Such a statute, how-

ever phrased, is in effect a condition on which the right to do business within the state depends. [Citing cases.] * * * If they take the corporation out of the state, they may declare dividends as they please. If they elect to keep it with us, they must not lead it into paths of ruin. In these days, when countless corporations, organized on paper in neighboring states, live and move and have their being in New York, a sound public policy demands that our legislature be invested with this measure of control. If the control is irksome, it may be avoided by leaving us."

In the case of Weiditschka v. Supreme Tent K. M. W., 188 Iowa 183, 186, 170 N. W. 300, 301, speaking of the right of a foreign corporation to do business in Iowa this court (LADD, J.) said:

"The defendant association had no right to transact business in this state without permission, and even then was bound to proceed in accordance with its laws." Citing many cases.

In State ex rel. Weede v. Iowa Southern Util. Co., supra, on page 827 of 231 Iowa, page 395 of 2 N. W. 2d, regarding the claim that the Delaware law governed in this particular transaction (stock reissue of August 1, 1938) this court said:

"Here are all of the parties, the records, the property, the books. Any decree can be made effective and enforced. *No law of Delaware needs to be construed.* [Italics supplied.] This court would be derelict in its duty to the public, and to all parties interested, if it declined jurisdiction and compelled the plaintiff to seek relief in the courts of Delaware, in violation of every consideration above set out."

This court then quoted from Scholl v. Allen, 237 Ky. 716, 726, 36 S. W. 2d 353, 358:

"The vague principle that courts will not interfere with the internal affairs of a corporation whose foreignness is at best a metaphysical concept must fall before the practical necessities of the modern business world."

Neither justice nor the practical necessities of the modern business world can lend a sympathetic ear to the claim

of a foreign corporation with all of its business in Iowa—plants, records, officers, etc.—that under its articles issued to it by the authority of the foreign state, it can come into our state and violate its statutory requirements.

 Let us see what the effect of this reclassification was so far as the 100,000 shares of worthless stock were concerned. This worthless stock under such plan was to be canceled and there were reissued in lieu thereof the 39,468 shares of new common stock each with a value of $15 per share, thus giving to such shares a total dollar value of $592,020 of equal parity to the retired preferred stock, save as to the payment of overdue dividends. In argument counsel characterized this transaction as "reaching up and pulling over a half million dollars out of thin air." Judging from its effects it can hardly be said that such was an overstatement. It seems to us that to put into effect such a transaction would be shocking to a moral or equitable conscience. It seems to us that those who professed to speak for the preferred stockholders were derelict in their duty to protect the interests of those in whose interests they were bound to act. Most of the preferred stock of the August 1, 1938 meeting was in the hands of proxies. As such proxies they would be bound to protect the interests of those for whom they were to act. It can hardly be said that they did so at this meeting.

IX. Appellants argue that the finding of the trial court as to the 39,468 shares of stock issued to Martha R. Bechtel should not be allowed to stand, for the reason that subsequent to such issue such stock had been transferred to persons not parties hereto and that such persons should be afforded the status of innocent purchasers.

The record shows that after the stock was issued, it was thereafter transferred to George M. Bechtel, trustee for Martha R. Bechtel, under date of November 8, 1938. The record indicates that on April 25, 1940 said trustee transferred said stock to Martha R. Bechtel. This action was instituted in November 1939. Later, and on advice of counsel, Martha R. Bechtel transferred said stock to various persons, many of whom were relatives.

At the trial below, Martha R. Bechtel, George M. Bechtel, and Harold R. Bechtel defended and litigated the issue of the

**1322**

validity of the 39,468 shares of stock. Thus we have the situation in the present case of the Bechtels—all parties herein—pleading and litigating the validity of such transferred stock. They now claim that the various persons holding such shares not being in court cannot be concluded by the finding of the trial court as regards the validity of the stock held by them. Yet we find them trying the issue and prosecuting this appeal.

■ We think that the holders are concluded by the trial below in which the Bechtels defended such stock. It seems to us that all of the transferees of Martha R. Bechtel were her privies and that any judgment rendered in the case against her would be binding upon them as privies. Under the record such transferees obtained the stock of Martha R. Bechtel after the present litigation had started. Lamb v. Cramer, 285 U. S. 217, 76 L. Ed. 715; Green v. Grant, 134 Mich. 462, 96 N. W. 583; Smith v. Kessler, 22 Idaho 589, 127 P. 172; Factor Oil Co. v. Brydia, 184 Okla. 113, 85 P. 2d 311; Louis v. Trustees of Brown Twp., 109 U. S. 162, 3 S. Ct. 92, 27 L. Ed. 892.

■ In Home Trading Co. v. Hicks, Tex. Civ. App., 296 S. W. 627, 630, the court said:

"'Privity' is defined to be mutual or successive relationship to the same rights of property * * * and accrued subsequent to the commencement of that action."

See also Ames v. Herrington, Tex. Civ. App., 139 S. W. 2d 183; Lamar County v. Talley, Tex. Civ. App., 127 S. W. 272; Urban v. Bagby, Tex. Civ. App., 286 S. W. 519, 525; Woodward v. Jackson, 85 Iowa 432, 52 N. W. 358 (defining term "privity"); McDonald & Co. v. Gregory, 41 Iowa 513; Bean v. Commercial Securities Co., 25 Tenn. App. 254, 156 S. W. 2d 338; Gill v. Porter, 176 N. C. 451, 97 S. E. 381; Orthwein v. Thomas, 127 Ill. 554, 21 N. E. 430, 4 L. R. A. 434, 11 Am. St. Rep. 159; Brown v. March, 111 Okla. 288, 242 P. 155; Savage v. North Anson Mfg. Co., 124 Maine 1, 124 A. 721; 50 C. J., Privity, 403 et seq.

We hold that the holders of any of the 39,468 shares of stock do not stand as innocent purchasers and that their rights therein are not superior or higher than those of Martha R. Bechtel, or any of the Bechtels.

X. Both appellants and the Utility Company argued that the trial court in its finding and decree was so solicitous in attempting to protect the 4000 stockholders that the court lost sight of some of the legal principles and controlling issues in the case. The record shows that the trial court in the oral finding did express concern for this group. In that finding the trial court condemned the activities and actions of the Bechtels, stating that the small stockholders should not have their holdings invalidated or rendered worthless by the actions of the Bechtels. We quote from said oral holding:

"The Bechtels have been punished in this lawsuit as much as is in my power to do. I do not believe I should be asked, as the legal executioner, to legally and financially execute four thousand small stockholders. * * * Courts are instituted for the purpose of doing justice, and when a shocking result is reached any court should study carefully whether the facts and the law justify it. Now there is a rule of law, where an act is subject to two constructions, one that it is lawful and the other that it is unlawful, and when the construction making it unlawful would wreck financially thousands of innocent people, and the other construction that it is lawful would hurt no one, then the court should adopt the construction that the act is lawful, and not unlawful. So in this case whenever I find these acts—. and I must say there is quite a number of them, I must view with a lack of judicial enthusiasm, when I find where the record shows one entry you could put one construction on or another, and both be consistent, and one construction is going to ruin these four thousand small stockholders and the other is not, I am going to adopt the construction that will save these four thousand small stockholders, especially in this case where the plaintiff has the burden of proof."

The record shows that these 4000 stockholders on August 1, 1938 held preferred stock in the Utility Company—it had value —it had been receiving one half of the regular dividends. In ✓ exchanging this stock for the new common stock at the ratio authorized under the plan of August 1, they were parting with real consideration. As indicated by the trial court, to invalidate the stock received would result in loss, untold confusion, and

endless litigation. To sum the matter up the court based its decision upon the facts and applied the broad equitable doctrine of doing justice as between those who were innocent and others who were derelict. The trial court may have overlooked some of the niceties and technicalities set forth in pleadings and urged in argument, but on the other hand, we think that in the end substantial and practical justice was contemplated and was done.

We hold, as did the trial court, that the appeal of the Bechtels cannot be sustained; and that the decree of the trial court was eminently fair, just and equitable and should be and is sustained.

XI. We will next take up and consider the appeal of the plaintiff. Generally speaking such appeal deals with certain activities and stock issues relating to the Maine corporation and the taking over and issuance of stock in regard to Creston and Burlington properties. However, the trial court called attention to the fact that other suits were pending touching such transactions and declined to consider them in the present trial.

Plaintiff, State of Iowa ex rel. J. B. Weede, has appealed from the finding and decree adverse to its claim, such adverse holding being set forth in the record. Due to the manner in which the argument has been set forth in its appeal, we will refer to it as the plaintiff. In the beginning, plaintiff adopts and makes the brief and argument filed on behalf of Ila Faye Thatcher and Nancy Rosseau, intervenors-appellees, and that of Elery Scott, cross-petitioner-appellee, a part of its (plaintiff's) brief and argument, the same as though set out at length therein.

As we understand the brief and argument of the intervenors and the cross-petitioner, it is devoted largely to arguments to sustain the trial court in its finding that the new common stock (39,468 shares) was void and without right to participate in the control or management of the Utility Company.

The plaintiff-appellee made the claim below and repeats it in this court that certain properties were bought by George M. Bechtel, who later, acting in collusion with certain officials of the Utility Company, resold said property to said Utility Company at a highly excessive price and thereby derived an unlawful profit therefrom. Said plaintiff-appellee further prayed that

certain stock issued by the Utility Company be declared void on account of being issued in violation of law, for general equitable relief, the appointment of a receiver, and the dissolution of the corporation and the winding up of its affairs, but reserving to all stockholders who purchased their stock lawfully, all rights guaranteed them by chapter 387, Code of 1935.

The trial court in an oral finding from the bench and prior to the written finding and decree stated that there were two things asked in the case—(1) the asking of plaintiff that certain stock be canceled, most of which was issued to the Bechtels, and (2) the question of receivership.

The trial court stated that there were other matters in the case which would not be passed upon, to wit, whether the Bechtels sold property to the Utility Company at a higher price than they paid for it and whether they received discounts on bonds and notes sold to them. The trial court called attention to the fact that other suits were pending in behalf of the corporation by its stockholders asking recovery from the Bechtels on property sold to the corporation, on bond issues and other matters and that such were not included in the present case. Also that there was not involved in the present case a certain note of $586,761.77 that the Bechtels gave the Utility Company on or about December 31, 1931, or a loan of $60,000 by the Utility Company at the time they were in failing circumstances. We quote from the oral finding of the court:

"All that is included in this case is whether the company was violating Chapter 387, which is a Chapter relating to foreign utility corporations, and what should be done if we find they were."

We agree with the conclusion above set forth as to the vital and essential issues involved in this case.

XII. Plaintiff claims that the trial court erred in finding that the Utility Company observed the Iowa law in taking over the assets of the Maine corporation; also, in taking over what is known as the Burlington properties. An examination of the record shows that the evidence supports such finding. Applications were duly made to take over such properties, the nature and extent thereof, the price to be paid, the liens and indebt-

edness to be assumed. The annual reports submitted to the State of Iowa showed such transactions. At various times reports were made to the proper state officials of stock issues, and the property received therefor. Annual reports were made by the Utility Company as a foreign corporation until August 2, 1929, when the secretary of state advised the Utility Company that due to a change in the law (chapter 14, Acts of Forty-third General Assembly) no further report of stock issues to the state would be required. The record shows that as to the Maine property the Utility Company was authorized to purchase the same for $2,531,725, to assume liens, etc. thereon in the amount of $2,036,000, and to issue stock to apply on the purchase price in the amount of $1,158,900. Authority was duly given to carry out this transaction. No stock in excess of the amount authorized was issued.

Practically the same procedure was followed by the Utility Company in acquiring the Burlington properties. An application was made for authority to purchase same, the price thereof and the nature and extent of the properties being purchased. Authority was given, the sale was consummated and duly reported. The assets to be taken over were valued at $4,198,000. Liens, etc. to be assumed amounted to $1,756,441.31 and stock authorized to be issued amounted to $1,520,000. The amount of stock issued did not exceed the amount authorized. The record further shows that at various times thereafter stocks were issued and sold and that the proper state officials were advised of such transactions. Some of the stock issued was of the preferred cumulative class—all being sold for the full par value thereof.

In 1924, the articles of incorporation were amended and said amendment dealt with the rights of preference of the preferred stock. In December 1926, the Utility Company further amended its articles of incorporation, in which amendment the authorized capital stock was changed to 250,000 shares of stock of which 150,000 was preferred, $100 par value per share, and 100,000 common stock without par value. Said amendment also provided for the taking up and reissue of outstanding preferred and no-par common stock; also dealt with the relative values to be given in such change, and provided that the Utility Company would have a right to issue preferred stock in seven

per cent, six and one-half per cent and six per cent series. A report was duly filed with the secretary of state showing such amendment.

The record further shows that at all times following the granting of authority of the Delaware Company to do business as a foreign corporation down to August 1, 1938, reports had been made by the Utility Company to the proper officials, said reports showing the capital structure of such company, its property, stock outstanding, and various transactions covering the acquiring of property and other matters required to be shown. It further appears that the Utility Company made written reports to its stockholders showing said stock issues. No agency of the State, so far as the record shows, ever made any objection to the various operations and activities of the Utility Company after full information was given the state officials of its operations and activities.

The parties herein, in written briefs, have set forth much of the evidence, especially that dealing with values of the various properties and the stock interests of the parties. The Bechtels and the Utility Company argue at length that the pleadings of plaintiff, those of intervenors, and those of the so-called cross-petitioners, are conflicting and do not when considered together warrant the trial court in granting such parties any relief. Such matters are argued at length, much evidence is set forth, and numerous legal authorities are cited, some setting forth the legal rules claimed to govern and others showing application of the evidence. As we view the situation and the issues, the facts are controlling and a discussion or analysis of the authorities cited would serve no useful purpose. The trial court heard the evidence. The record indicates that the trial court was fully cognizant of the matters being litigated and diligently sought to get at the vital issues and avoided being diverted therefrom to follow matters and side issues having no bearing on the real controversy. The court's analysis of the whole record is revealing.

The transactions involved herein cover a period of over twenty years. Much of the evidence deals with the many phases of corporate operation, control, and financing. Evidence given by accountants is voluminous and most of it was derived from a long study of the records of the Utility Company and those

of the Bechtels. To attempt to set forth even a summary of such evidence would serve no useful purpose and would extend this opinion to wearisome length. The trial court had the witnesses before him and listened to their testimony, following which such court made a clear and concise finding and decree. The trial court was of the opinion that essentially and in the last analysis the facts controlled.

We have gone over the record with care. We hold that the case is to be affirmed on both appeals.—Affirmed on both appeals.

MULRONEY, C. J., and OLIVER, BLISS, GARFIELD, SMITH, and HAYS, JJ., concur.

SMITH, J., and MULRONEY, C. J., and OLIVER, MANTZ, and HAYS, JJ., specially concur.

SMITH, J. (specially concurring)—I entertain no doubt of the justice of the decision which the majority opinion affirms. I think we should point out however that it is not arrived at in violation of sound rules of procedure taking into account the form and purpose of the suit as instituted. The decision on former appeal (231 Iowa 784, 2 N. W. 2d 372) established that sufficient facts were pleaded to state a cause of action for at least part of the relief demanded. But it did not, and perhaps could not at that stage of the proceedings, determine the question now presented.

Appellants vigorously—and plausibly—contend the case, as originally brought, was *"in the nature of quo warranto"* and could be maintained by the State only for violation of then Code chapter 387 (now chapter 495, Code, 1946); and only to question corporate existence, or to dissolve for acts or omissions constituting a forfeiture of the corporation charter. They argue this was the only right or interest the State could have; also that there can be no joinder of any other cause of action, citing section 12418, Code, 1939, now superseded by Rule 301, Iowa Rules of Civil Procedure.

Their argument also asserts there was no pleaded issue between intervenors and appellants as to validity of the new shares, except as related to the alleged violation of said Code chapter 387; and that if there had been such an issue tendered,

based upon alleged unfairness of the new plan as between the various classes of old stock, it would have constituted a misjoinder.

Appellants are wrong in their major premise. The action is not "in the nature of quo warranto" though it may sometimes serve the same purpose. It is a suit in equity, brought under what is now section 495.6, Code, 1946 (formerly section 8438, Code, 1939) which provides, so far as pertinent here:

"Courts of equity shall have full power to dissolve, close up, or dispose of any business or property owned, operated, or controlled in violation of the provisions of this chapter * * * and if the court finds that, in order to carry out the purposes of this chapter, it is necessary so to do, it may dissolve the corporation issuing the stock which is owned in violation of the provisions of this chapter * * *."

This is materially broader than section 491.66, Code, 1946 (formerly section 8402, Code, 1924) which was referred to and involved in Kosman v. Thompson, 204 Iowa 1254, 1256, 215 N. W. 261, 262, cited by appellants. The latter section provides only that courts of equity shall have full power "to dissolve or close up the business" of the offending corporation and "to appoint a receiver therefor." In the Kosman case it was held that the statutory equity suit was within the power of the legislature to enact and that the State was not limited to the law action of quo warranto for ouster or dissolution of the corporation. See Platner v. Kirby, 138 Iowa 259, 115 N. W. 1032. There is in the Kosman case no suggestion that the statutory equitable suit is in the nature of quo warranto or that interested parties might not join therein and obtain protection of their respective rights by some remedy short of total destruction of the corporation.

Section 495.6, quoted above, is even more elastic. It authorizes dissolution and receivership *if the court finds it is necessary* "in order to carry out the purposes of this chapter." But it does not limit the court to this remedy or *require* such dissolution or receivership in all cases. It permits the court of equity to "dispose of any business * * * operated * * * in violation of the provisions of this chapter" and expressly pro-

vides: "\* \* \* reserving, however, to the stockholders owning capital stock not held in violation of this chapter all rights possessed by them."

■■ I construe this to mean that the court may dispose of the situation in such equitable manner as will best preserve the rights of all interested parties. Stock issued for property other than money, without compliance with sections 492.6 to 492.10, inclusive, Code, 1946, is not void but voidable. Bankers Trust Co. v. Rood, 211 Iowa 289, 295, 233 N. W. 794, 73 A. L. R. 1421; Sherman v. Smith, 185 Iowa 654, 169 N. W. 216. The court is not required to invalidate all such stock alike, where as here there is sound equitable ground for canceling some and allowing some to stand.

There is language in the opinion on former appeal at variance with the view just expressed (231 Iowa 784, 803 et seq.). However, it did not become the law of the case. That was a minority opinion representing the view of but four members of the court. A fifth concurred only in the result, three members dissented and one apparently did not vote.

In Gary Realty Co. v. Swinney, 322 Mo. 450, 458, 17 S. W. 2d 505, 508, under comparable circumstances the Missouri Supreme Court said:

"This situation warrants the conclusion that the two judges concurring in the result only, did so on grounds other than the one assigned by the writer of the opinion. For the reasons stated, this opinion is not the law of the case \* \* \*."

See also Turner v. Fidelity Loan Concern, 2 Cal. App. 122, 83 P. 62, 70.

■ Furthermore, the doctrine of "law of the case" is not invariably applied, In re Estate of Hermence, 235 Iowa 745, 749, 15 N. W. 2d 905, 907, and should not be utilized to accomplish an obvious injustice. Cochran v. M. & M. Transportation Co., 1 Cir., R. I., 110 F. 2d 519, 521; Johnson v. Cadillac Motor Car Co., 2 Cir., N. Y., 261 F. 878, 882 et seq., 885, 8 A. L. R. 1023, 1031.

In the last cited case it is said:

"The fact that the action is the same action, and the litiga-

tion has not yet terminated, and the further fact that the original error, if error was committed, was the error of a divided and not a unanimous court, are circumstances which are entitled to consideration."

It seems to me the language of section 495.6 (formerly section 8438, Code, 1939) does not require us to hold the stock void. In that respect it does not materially differ from section 492.10, Code, 1946 (formerly section 1641-d, 1913 Supplement to the Code) which was considered in Bankers Trust Co. v. Rood and Sherman v. Smith, both supra.

We are not required here to say how far the State (by either the attorney general or a private relator) would be held to be an interested party in adjusting equities among various classes of stockholders when dissolution of the corporation is not required. Undoubtedly the corporation itself and its stockholders have their remedies in equity entirely apart from the remedies of the State. 18 C. J. S., Corporations, section 248 et seq.; Platner v. Kirby, supra, 138 Iowa at page 266, 115 N. W. at page 1034. There would seem to be no sound technical procedural considerations forbidding joinder of suits and disposition of the entire matter as was done here.

All necessary parties are in the present suit either directly or by representation. There are those former holders of original no-par common stock and also some former holders of the old preferred stock to whom has been issued and who have accepted the new $15 par value common in exchange for their former holdings. There are also some who have refused to accept the new issue in exchange for their old stock.

The pleadings are prolix and complex, perhaps confused. This court is not required to untangle them since no one has appealed except the defendants who received $15 par value common stock in exchange for their former worthless no-par common, and plaintiff relator who, purporting to speak for the State of Iowa, demands total destruction of the corporation. None of these appellants is prejudiced by any failure of appellees directly to pray for the exact relief granted by the trial court. The *facts* were all pleaded and there were ample prayers for general equitable relief.

As I said at the outset, I am convinced of the justice and equity of the decree, and I concur in the majority opinion with this addition thereto.

MULRONEY, C. J., and OLIVER, MANTZ, and HAYS, JJ., join in this special concurrence.