Marla ROWEN, Mary E. Farnsworth, Charles W. Orr, Douglas L. Tindal, for themselves and all other Policyholders-Members of Le Mars Mutual Insurance Company of Iowa and for themselves and all others similarly situated, Appellees,

v.

LE MARS MUTUAL INSURANCE COMPANY OF IOWA, Alice Alesch, Executor of the Estate of John Alesch, a/k/a John H. Alesch, Joe L. Alesch, Clyde Eastman, Alice W. Alesch, M. H. Tappan, W. K. Tappan, P. G. Vander Merr, a/k/a P. A. Vander Meer, M. H. Gearke, John M. Vollmar, a/k/a John Vollmar and Burton Dull, and The Iowa Mutual Insurance Company of DeWitt, Iowa, Raymond A. Brown, William Couch, George S. Howes, Carl J. Smith, Carman G. Smith, John R. Wilkinson, J. Ray Judge, D. M. Molyneaux, and W. L. Rutenbeck, and Alesch, Inc., Margaret A. Sevenich, Mary Kay Buffington, and Jane M. Warnock, Appellants.

No. 61360.

Supreme Court of Iowa.

July 11, 1979.

Supplemental Opinion Sept. 19, 1979.

Thomas L. McCullough of McCullough Law Firm, P. C., Sac City, for Iowa Mutual Insurance Co. of Iowa and Alesch, Inc.

Marvin F. Heidman of Gleysteen, Harper, Eidsmoe & Heidman, Sioux City, for Alice Alesch, individually, and as Executor of the Estate of John Alesch, deceased, Margaret A. Sevenich, Mary Kay Buffington, and Jane M. Warnock.

R. Richard Bittner and Robert D. Lambert of Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, for D. M. Molyneaux.

James W. Crawford and Gerald T. Sullivan of Keyes & Crawford, Cedar Rapids, for John C. Howes.

Timothy J. Walker and Kermit S. Sutton of Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for R. A. Brown, William Couch, George S. Howes, Carl J. Smith, Carman G. Smith, John R. Wilkinson, J. Ray Judge, and W. L. Rutenbeck.

James M. McNally & James L. George of McNally & George, Le Mars, for John M. Vollmar, Peter A. Vander Meer, and Clyde Eastman.

Robert E. Beebe of Kindig, Beebe, McCluhan, Rawlings & Nieland, Sioux City, for M. H. Gearke.

Frank Jacobs of Jacobs, Gaul, Nymann & Green, Sioux City, for M. H. Tappan and W. K. Tappan.

Charles R. Wolle of Shull, Marshall & Marks, Sioux City, for Burton Dull.

Robert D. Mishne and A. J. Stoik of Stewart, Hatfield, Klass & Whicher, Sioux City, for Le Mars Mutual Insurance Co. of Iowa.

Raymond E. Franck and Michael R. Mundt of Raun, Franck, Mundt & Nepper, Denison, and David C. Bayne, Iowa City, for appellees.

Richard C. Turner, Atty. Gen., and Bruce W. Foudree, Asst. Atty. Gen., for amicus curiae, Herbert W. Anderson, Commissioner of Ins.

LeGRAND, Justice.

This interlocutory appeal is here in a derivative action commenced by two policyholders of Le Mars Mutual Insurance Company (Le Mars) to set aside a contract between Iowa Mutual Insurance Company of DeWitt (Iowa Mutual) and Alesch, Inc. by which control of Le Mars was allegedly illegally transferred to Iowa Mutual. Plaintiffs ask both compensatory and punitive damages and seek general equitable relief.

The defendants are Iowa Mutual and its officers and directors; Alesch, Inc., and its officers and directors; and the officers and directors of Le Mars. Le Mars, the corporation for whose benefit this derivative action was brought, is a nominal defendant.

The trial court found generally for plaintiffs, determined liability of the defendants, reserved the assessment of compensatory damages, and fixed the punitive damages which defendants were to pay. The decree also directed Iowa Mutual to transfer all outstanding stock of Alesch, Inc. to Le Mars. It ordered that Iowa Mutual and Le Mars be "separated," and it provided for the appointment of interim directors and for the ultimate election of new directors for both Le Mars Mutual and Alesch, Inc. under court supervision. Finally the trial court announced its intention to appoint a special master "to make detailed and plenary investigation of all transactions between Le Mars, Iowa Mutual, and Alesch Agency" with authority to hold evidentiary hearings ". . . and prepare proposed findings upon matters of damages for submission to the [trial court]." We modify and affirm in part, reverse in part, and remand for further proceedings.

By an order dated January 5, 1978, we held the trial court decree to be interlocutory and granted defendants permission to take this appeal. This is the second interlocutory appeal in this case. *See Rowen et al. v. Le Mars Mutual Insurance Company of Iowa et al.,* 230 N.W.2d 905 (Iowa 1975). We reserved the question whether Le Mars' separate application to cross-appeal was

timely. We need not decide that matter because of the disposition we make of other issues.

The parties raise numerous issues. We discuss separately those necessary to our decision; but, whether discussed or not, we have considered all of them. First we dispose of several preliminary matters.

## I. Scope of Review.

■ We are urged to treat this as an appeal on errors only and not accord it de novo review even though it arises in equity. This, we are told, would conform to the apparent trend in federal courts as exemplified by *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729, 736–38 (1970). We are not bound by the federal rule, and we believe our own long-established one is preferable. *Holi-Rest, Inc. v. Treloar,* 217 N.W.2d 517, 523 (Iowa 1974); *Holden v. Construction Machinery Co.,* 202 N.W.2d 348, 354 (Iowa 1972); *Des Moines Bank & Trust Co. v. Bechtel & Co.,* 243 Iowa 1007, 1080–81, 51 N.W.2d 174, 216 (1952); Iowa R.App.P. 4. We consider the matters before us de novo.

## II. Status of Le Mars Mutual as Defendant.

The parties disagree over the status of Le Mars Mutual and its right to participate actively in the litigation.

■ As already mentioned, this is a derivative action brought by two policyholders on behalf of Le Mars Mutual. Under such circumstances, the corporation for whose benefit the suit is brought, although actually the plaintiff, is a nominal defendant. *Holi-Rest, Inc. v. Treloar,* 217 N.W.2d at 523 and authorities there cited; *Holden v. Construction Machinery Co.,* 202 N.W.2d at 367; *Des Moines Bank & Trust Co. v. Bechtel & Co.,* 243 Iowa at 1083, 51 N.W.2d at 217.

Le Mars Mutual should take no active part in the controversy, merely awaiting the outcome and reaping the fruits of any judgment for plaintiffs; but here the company asserted various cross-claims against the other defendants and took active—even aggressive—part in the trial over the strenuous objections of the other defendants. In allowing this procedure, the trial court warned that the ruling was subject to reconsideration. Later the ruling was reversed as is shown by this quotation from the decree:

> The legal theories and rights to relief asserted by Le Mars Mutual were similar to the amended and recast petition which plaintiffs also asked permission to file. This Court, noting of record the importance of a plenary hearing to avoid retrial of any issues in this costly and protracted litigation, overruled objections and permitted Le Mars Mutual and plaintiffs to assert parallel claims for relief. Now, the submission of this case having been completed, the Court believes that Le Mars Mutual should not be permitted to assert independent claims against Iowa Mutual and other defendants. As nominal defendant in a derivative action, Le Mars Mutual has the duty to maintain strict neutrality in the struggle between policyholders and corporate personnel. Where, as here, the policyholders are represented by able and aggressive counsel, there is no reason to depart from the posture of neutrality. This Court believes that sound principles of judicial administration compel the conclusion that the proper role of independent counsel for Le Mars Mutual is established by the required neutrality of the corporate entity, and that the affirmative cross-claims urged by independent counsel are unnecessary and unwise as precedents for future derivative litigation. Accordingly, the cross-claims of Le Mars Mutual are stricken from the record of this case.

■ We believe the trial court was right, and we affirm the dismissal of the cross-claims. We believe this makes it unnecessary, too, to decide whether Le Mars Mutual's notice of cross-appeal was timely, a matter reserved in our order of January 30, 1978.

■ As a related issue arising out of Le Mars Mutual's participation in the trial, the other defendants insist they were prejudiced by having it as an additional foe. We

cannot see how defendants can seriously claim prejudice. They were not required to meet any new issues or make any defenses they would not otherwise have made. Neither did they face any evidence which would not have been equally relevant without the participation of Le Mars. Defendants' claim of prejudice is without merit.

### III. *Admissibility of Testimony of Richard Fischer.*

This issue is one raised by Le Mars. Since its cross-appeal has been dismissed, perhaps the matter should be disregarded. However, we elect to state why we believe the trial court was right in refusing to allow Fischer's testimony. We do so because it was a hotly contested issue at trial and was treated extensively in the briefs.

Fischer had not been noted as an expert witness to be used to establish valuation of the stock of Alesch, Inc., although a pre-trial order directed that the names of all expert witnesses should be disclosed. When it was sought to introduce his testimony, the trial court sustained defendants' objections.

The reason for doing so is set out as follows in the decree:

The parties have had more than four years to prepare this case for trial. Under such circumstances, the calling of Fischer without prior disclosure constituted an attempt to evade the spirit and purpose of this Court's order of April 22, 1977. The exclusion of Fischer's testimony is affirmed.

The trial court was well within its discretion in excluding this testimony. Pretrial procedure is governed by rules 135–39, Iowa R.Civ.P. Rule 138 specifically authorizes the trial court to enter appropriate orders for the "subsequent course" of the action. This includes the inherent power to enforce those orders by appropriate sanctions. Unlike the rules of discovery, there are no specific sanctions established by our pretrial rules. We nevertheless believe such power is inherent. Otherwise the rule is meaningless. *Cf. Haumersen v. Ford Motor Co.,* 257 N.W.2d 7, 13–14 (Iowa 1977) (explaining rationale for sanctions under discovery rules).

Nor do we find this ruling violates rule 139, Iowa R.Civ.P., which provides a party may not be required to list the witnesses by whom he expects to prove his case. Under rule 122(4), defendants could have discovered the identity of all proposed expert witnesses. The pretrial order made this unnecessary. Failure to abide by the terms of the pretrial order had the effect of depriving defendants of their right to discover. This was patently unfair, and the trial court did not abuse its discretion in refusing to allow Fischer to testify. *Cf. In re Will of Smith,* 245 Iowa 38, 45–46, 60 N.W.2d 866, 870–71 (1953) (court has inherent power to exclude testimony for violation of a pretrial order.)

### IV. *Statute of Limitations.*

Defendants argue plaintiffs' suit is barred by laches and the statute of limitations. The trial court ruled against both contentions, and we agree.

The claims asserted here arose in 1970. Suit was started in 1973. In April, 1977, (more than six-and-a-half years after the transaction) plaintiffs filed an amended and recast petition. Defendants argue the amended petition alleged new theories of liability and that it is barred by § 614.1(4), The Code Amendments filed after the statute of limitations has run are permissible if they relate to or amplify a claim already made. However, an amendment may not be used to set out a new and distinct cause of action against which the statute of limitations has run. *In re Estate of Poulos,* 229 N.W.2d 721, 725 (Iowa 1975); *Swartz v. Bly,* 183 N.W.2d 733, 737 (Iowa 1971).

This action arises out of a contract between Iowa Mutual and Alesch, Inc. It was partially written and partially based on oral agreements. We are not at all certain the applicable statute is § 614.1(4) rather than § 614.1(5). The latter permits actions on written contracts to be brought within ten years. However, even if we accept defendants' theory, the action is not barred. The original petition alleged generally breach of

fiduciary duty, illegal sale of control of Le Mars, and wrongful payments to Iowa Mutual and various individual defendants of management fees, dividends and salaries. It also claimed the "premium" paid for Alesch, Inc. stock and pensions paid to Le Mars' directors should be returned to Le Mars.

The amended and recast petition alleged these same theories of liability with more detailed statements of the acts relied on and with a request for additional relief. We are disposed to agree with the trial court that the recast petition alleged no new theories of recovery. In any event there is another reason for denying defendants relief on this ground.

The underlying charge upon which plaintiffs rely is violation of defendants' fiduciary duties and their failure to give loyal and faithful service to Le Mars. Courts are reluctant to afford the benefit of the statute to those who violate fiduciary duties. *Pride v. Peterson,* 173 N.W.2d 549, 555 (Iowa 1970); *Higbee v. Walsh,* 229 Iowa 408, 421–25, 294 N.W. 597, 605–07. *See also Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* 372 A.2d 168, 169–70 (Del. 1976).

We hold the statute of limitations does not bar plaintiffs' action.

V. *Laches.*

Defendants argue that all claims against them are barred by laches. The party asserting the affirmative defense of laches has the burden to establish its essential elements by clear, convincing and satisfactory evidence. Moreover, laches cannot ordinarily be claimed against one beginning an action within the statute of limitations, absent special detriment to another. *Moser v. Thorp Sales Co.,* 256 N.W.2d 900, 908 (Iowa 1977); *see also Anita Valley, Inc. v. Bingley,* 279 N.W.2d 37 (Iowa 1979); *Holden v. Construction Machinery Co.,* 202 N.W.2d at 356; *Pap v. Pap,* 247 Iowa 371, 383, 73 N.W.2d 742, 749 (1955). Laches will be applied only when it is inequitable to permit recovery. *Lovlie v. Plumb,* 250 N.W.2d 56, 63 (Iowa 1977); *Chadek v. Alberhasky,* 253 Iowa 32, 40, 111 N.W.2d 297, 301 (1961). Defendants claim special circumstances exist in the present case because of the death of John Alesch; they assert plaintiffs purposely delayed filing suit until Alesch was dead to prevent the use of his testimony.

While loss of material testimony is a factor to be considered (*see Chadek,* 253 Iowa at 40, 111 N.W.2d at 301), it alone is not enough to establish laches. The doctrine is available only when clearly demanded in the interests of justice. This is not such a case, and we reject defendants' claim to the contrary.

VI. *Burden of Proof.*

The defendants raise objection to a statement in the decree in which the trial court said that "upon the finding that the defendants actively concealed important characteristics of the transaction from the parties in interest, the court does not hesitate to place [the] burden of proof upon the defendants."

Defendants argue that the plaintiffs should have the burden of proving their case, and this is, of course, the general rule. However, when a violation of fiduciary duty is involved, the fiduciary must establish he properly discharged his obligation. *Perlman v. Feldmann,* 219 F.2d 173, 177 (2d Cir. 1955), *cert. denied* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Holi-Rest, Inc. v. Treloar,* 217 N.W.2d at 525; *Gord v. Iowana Farms Milk Co.,* 245 Iowa 1, 18, 60 N.W.2d 820, 829 (1953) and citations.

We believe the trial court correctly applied this rule.

VII. *Dismissal of John C. Howes and Alyce M. Breese, Executor of Estate of John Breese.*

The trial court dismissed the above named defendants from the case at the conclusion of the trial. There appears to be only minimal objection to the ruling. We hold the trial court was correct in both instances.

VIII. *The Parties.*

Exclusive of Le Mars, which is only nominally a defendant, there are twenty-five

defendants to this action. We classify them according to their status for convenience in considering the issues raised. The reasons for such classification appear later in this opinion.

The principal defendants are Iowa Mutual and its directors. At the time of the events under consideration, the directors of Iowa Mutual were Carl J. Smith, Carman C. Smith, R. A. Brown, William Couch, George S. Howes, John R. Wilkinson, J. Ray Judge, D. M. Molyneaux, and W. L. Rutenbeck.

The last four (Wilkinson, Judge, Molyneaux, and Rutenbeck) were outside directors. We have determined they are without liability. Throughout this opinion our references to Iowa Mutual and its directors are limited to those directors who served as officers, comprised the executive committee, and fixed the policy of the corporation.

Le Mars' board of directors was comprised of nine members. Two of them, John H. Alesch and Joe L. Alesch, were dead at the time of trial. By agreement of the parties, the action was dismissed as to Joe L. Alesch. Alice W. Alesch was made a defendant as executor of the estate of John H. Alesch. The other directors were M. H. Tappan, Alice W. Alesch, Wilhelmine Koehler Tappan, M. H. Gearke, John M. Vollmar, P. G. Vander Meer, and Clyde Eastman. We find all of them (except Joe L. Alesch) liable and our references to the Le Mars' directors include all of them without separate designation.

Alesch, Inc. is one of the defendants. Its directors were John H. Alesch (now deceased), Alice W. Alesch, and Margaret A. Sevenich. Mary Kay Buffington and Jane M. Warnock were also made defendants as stockholders of Alesch, Inc. Our references to Alesch, Inc. (or the Alesch Agency) include all of these persons.

Burton Dull was counsel for Le Mars during the events in question. We treat his status separately.

IX. *Factual Background.*

Before taking up other issues, we relate the facts giving rise to this controversy. The case concerns the activities of three corporations, Iowa Mutual, Le Mars, and Alesch, Inc. The dominant role played by John H. Alesch in the affairs of both Le Mars and Alesch, Inc., is the catalyst which eventually led the parties to this court. For the present, we limit our discussion to the conduct of John H. Alesch. We hold he violated his fiduciary duty as an officer and director of Le Mars. We reserve until later our reasons for holding some of the other defendants must share his culpability.

For many years Le Mars Mutual was a successful mutual insurance company, operating principally in northwest Iowa. John H. Alesch, one of its directors, was the most influential single person in the management of its affairs and in determining its day-to-day policy.

During much of that time, John H. Alesch was also in sole control of an insurance agency, in which he acquired a partial interest in 1940. He and his wife became the sole owners in 1957 and later (1962) the business was incorporated under the name of Alesch, Inc. (John H. Alesch and his wife Alice each owned one fourth of the outstanding stock and their three daughters, Margaret A. Sevenich, Mary K. Buffington, and Jane M. Warnock, each owned one sixth. However, John H. Alesch was the one who alone managed its affairs and dictated its policies.)

Alesch, Inc. had an unusual working arrangement with Le Mars Mutual which is described in the decree this way:

> For all times material hereto, Le Mars Mutual and the Alesch Agency enjoyed a unique relationship of independence and prosperity. The agency was housed in the corporate offices of Le Mars Mutual and provided the company with an obvious and publicly accessible outlet for its insurance products. The agency became one of Le Mars Mutual's most productive sources of business and assisted the steady growth of the company. The growth of Le Mars Mutual was mirrored in the success of the agency. As Le Mars Mutual prospered, the agency reaped the benefits of an in-house location and easy

public identification with a healthy home town insurance company which customers within the local trade area wished to patronize. The agency was also aided in its growth by a favorable overhead arrangement with Le Mars Mutual. The physical plant of the agency consisted of a desk, filing cabinet and telephone. The chief operating officer of Le Mars Mutual, John H. Alesch, conducted agency business during regular office hours. The agency and Le Mars Mutual shared a telephone. The receptionist for Le Mars Mutual took telephone calls for the agency and kept its day book. Le Mars Mutual employees ran errands for the agency and supervised its operations when the Aleaches were absent. Le Mars Mutual employees sold policies for the agency, allowed the agency to use company copies of insurance policy DEC sheets and completed state accident reports for agency customers—a service performed for customers of other agencies rarely, if at all. For these services, the agency paid monthly rental to Le Mars Mutual of $165.00 until March, 1969 and $100.00 thereafter.

While obviously advantageous to John H. Alesch and his agency, this arrangement was by no means unilateral. Alesch, Inc. was the second biggest single producer of business for Le Mars, and the company benefited accordingly. Both profited by the set-up, which continued at least until the sale of the agency to Iowa Mutual in 1970.

There was nothing inherently wrong with this, and it is clear that for many years Mr. Alesch's professional life was devoted to the interests of those two corporations. However, some place along the way he came to view both as vehicles to advance his own interests and lost sight of his separate fiduciary obligations as an officer and director of Le Mars. Experience teaches this is a danger implicit when control of corporate affairs is invested in one person.

Alesch owed Le Mars complete loyalty, honesty, and good faith. *Perlman v. Feldmann*, 219 F.2d at 175–76; *Holi-Rest,*

*Inc. v. Treloar*, 217 N.W.2d at 525; *Holden v. Construction Machinery Co.*, 202 N.W.2d at 358; *Gord v. Iowana Farms Milk Co.*, 245 Iowa at 16–17, 60 N.W.2d at 829; *Des Moines Bank & Trust Co. v. Bechtel & Co.*, 243 Iowa at 1081, 51 N.W.2d at 216. His virtual dictatorship over the affairs of Le Mars heightened his duty to give it loyal and faithful service. *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802, 810 (1958). We are convinced he failed to do so.

From a review of the record, the conclusion is inevitable that in dealing with Iowa Mutual for the sale of Alesch, Inc., Mr. Alesch held out control of Le Mars as bait. His ability to deliver such control was a condition of the sale. Completion of the transaction, including payment to Alesch, Inc. stockholders, awaited the resignation of Le Mars' directors and election of new ones designated by Iowa Mutual, a maneuver Mr. Alesch easily accomplished with no murmur of protest.

It is here that the long and close relationship between Le Mars and Alesch, Inc. as previously described becomes important. In view of that history, it is incredible that Mr. Alesch did not offer Alesch Agency to Le Mars when a sale was contemplated. Plaintiffs claim this deprived Le Mars of a corporate opportunity rightfully belonging to it, a matter we discuss later. For present purposes we need say only that it was another act of disloyalty by Mr. Alesch toward Le Mars. When Mr. Alesch decided to sell his agency—a business which for years had been operated almost as part of Le Mars—he not only failed to give Le Mars an opportunity to buy it, but sold it instead to a possible competitor. (Actually he offered it to *two* possible competitors. His first proposal to Employers Mutual Casualty Co. of Des Moines failed.)

Defendants insist Alesch's only purpose was to assure continued expert management for both Le Mars and for Alesch, Inc. after his imminent retirement. Even if true, this would not permit the sale of control. Mr. Alesch could not profit from the transaction, no matter how high his motives. *Rosenfeld v. Black*, 445 F.2d 1337,

1343 (2d Cir. 1971), *cert. denied* 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972).

In any event we agree with plaintiffs that the plan was deliberately designed to allow Mr. Alesch, with the help of some of the defendants, to sell Alesch, Inc. for substantially more than it was worth by delivering to the purchaser complete control of Le Mars Mutual as part of the consideration.

We believe this is the correct version of his conduct. The evidence compels the conclusion that he failed to offer his agency to Le Mars because he could not then realize anything from his control of that company. In other words, he couldn't sell control of Le Mars *to* Le Mars.

Although plaintiffs advance other theories attacking the sale of Alesch, Inc. to Iowa Mutual, we depend, as did the trial court, on the illegal sale of control to set aside the transaction. We should perhaps point out here one unusual circumstance in this affair. In most sale-of-control cases, the sale involves control of the very corporation whose stock is being sold; but here the control illegally sold is that of a separate corporation—Le Mars. This makes the transaction even more suspect. There is no plausible theory upon which defendants can explain how the sale of Alesch, Inc. stock can legally carry with it control of Le Mars.

The transaction was thus contrary to public policy. We have long held contracts contrary to public policy are unenforceable. *Tschirgi v. Merchants National Bank of Cedar Rapids,* 253 Iowa 682, 689–90, 113 N.W.2d 226, 230 (1962); *Jones v. American Home Finding Association,* 191 Iowa 211, 213, 182 N.W. 191, 192 (1921); *Dodson v. McCurnin,* 178 Iowa 1211, 1214–15, 160 N.W. 927, 929 (1917). Although this principle is firmly established, it is not always easy to determine what is against public policy. 6A *Corbin on Contracts* § 1375 (1951). In *Jones v. American Home Finding Association,* 191 Iowa at 213, 182 N.W. at 192, we said:

It is a well-settled principle of the law that if a contract binds the maker to do something opposed to the public policy of the state, or conflicts with the wants, interests, or prevailing sentiment of the people, or his obligations to the world, it is void. The term "public policy" is not susceptible of exact definition.

If a contract is opposed to the interests of the public even though the intent of the parties is good and no particular injury to the public would result in the particular case, a court will hold that it contravenes public policy. The test is the evil tendency of the contract, and not its actual injury to the public in a particular instance.

However, we have never wavered from our insistence that those holding fiduciary positions must act with a high degree of fidelity; nor have we been reluctant to deny enforcement to contracts which violate that duty or which induce others to do so. *Aughey v. Windram,* 137 Iowa 315, 320–31, 114 N.W. 1047, 1048 (1948) (contract influencing a guardian to resign his position is void); *Cochran v. Zachery,* 137 Iowa 585, 589–91, 115 N.W. 486, 487–88 (1908) (contract inducing one to violate his trust is void); *Gleason v. Chicago, M. & St. P. R. Co.* (no Iowa citation), 43 N.W. 517, 518–19 (1889) (contract calling on one partner to violate his duty to another is unenforceable).

In *Aughey,* 137 Iowa 320, 114 N.W. 1049, this appears:

A trustee may not make use of his relations as such for personal emolument. An agreement for a valuable consideration to abandon the trust or to transfer it to another is void. He may voluntarily resign for reasons not mercenary in character, but has no right to traffic in or make merchandise of the confidence reposed in him.

The sale of control of a corporation has been declared to be violative of public policy, for the "management of a corporation is not the subject of trade and cannot be bought apart from actual stock control . . . ." *In re Caplan's Petition,* 20 A.D.2d 301, 303, 246 N.Y.S.2d 913, 915, aff'd mem. 14 N.Y.2d 679, 249 N.Y.S.2d 877, 198

N.E.2d 908 (1964). Those charged with corporate management hold control on behalf of the shareholders, "and therefore may not regard it as their own personal property to dispose of as they wish." *Essex Universal Corporation v. Yates,* 305 F.2d 572, 575 (2d Cir. 1962). *See also Doyle v. Union Insurance Co.,* 277 N.W.2d 36, 41–44 (Neb.1979).

We quote this from *Yates:*

It is established beyond question under New York law that it is illegal to sell corporate office or management control by itself (that is, accompanied by no stock or insufficient stock to carry voting control). . . . The same rule apparently applies in all jurisdictions where the question has arisen. . . . The rationale of the rule is undisputable: persons enjoying management control hold it on behalf of the corporation's stockholders, and therefore may not regard it as their own personal property to dispose of as they wish. Any other rule would violate the most fundamental principle of corporate democracy, that management must represent and be chosen by, or at least with the consent of, those who own the corporation.

Additional support for this principle is found in *Perlman v. Feldmann,* 219 F.2d at 176; *Cox v. Berry,* 19 Utah 2d 352, 431 P.2d 575, 577–78 (1967); *Mitchell v. Dilbeck,* 10 Cal.2d 341, 74 P.2d 233, 236 (1937); *McClure v. Law,* 161 N.Y. 78, 55 N.E. 388, 389 (1899); E. Hayes, *Sale of Control of a Corporation: Who Gets the Premium?,* 4 J.Corp.L. 243–257 (1979); *cf. Hoyt v. Hampe,* 206 Iowa 206, 219–20, 214 N.W. 718, 724–25 (1928) (applying rule in favor of creditors).

■ We hold the transaction between Iowa Mutual and Alesch, Inc. was a contract part of whose consideration was for Alesch, Inc. to deliver to Iowa Mutual control of Le Mars by securing the resignation of Le Mars' directors and guaranteeing the election of directors designated by Iowa Mutual. Under the above authorities, it is illegal and unenforceable.

Most of our discussion until now has centered around the conduct of John H. Alesch, and he was certainly the principal malefac-

tor. However, he was by no means the only one. Others must share the blame. We do not agree completely with the trial court as to liability for reasons set out later.

■ All who conspired or cooperated with John H. Alesch to accomplish the illegal sale of control over Le Mars Mutual are equally liable with him. *Des Moines Bank & Trust Co. v. Bechtel & Co.,* 243 Iowa at 1082, 51 N.W.2d at 217; *Gobel, Inc. v. Skipworth,* 232 Iowa 382, 388, 3 N.W.2d 551, 554 (1942); *Raines v. Toney,* 313 S.W.2d at 810. We must therefore inquire into the facts to discover who these persons are.

The gravamen of the charges against defendants is violation of their fiduciary duties, based in part on deception and failure to disclose material facts to, among others, the directors of Le Mars and some of the directors of Iowa Mutual.

■ We agree with the trial court that John H. Alesch on the one hand and the management (or inside) directors of Iowa Mutual on the other conspired, one to sell and the other to buy, control of Le Mars for a substantial monetary consideration. We agree, too, that vital information was withheld from those who had a right to know all the facts.

Defendants vigorously dispute this. They argue that full disclosure was made to all interested parties and to the insurance commissioner as well. We do not so view the record. Certainly the ultimate fact—the one of overriding importance—was not disclosed. We refer to the fact that Iowa Mutual was paying a substantial consideration in exchange for the resignations of Le Mars' directors.

We acknowledge there is disagreement over whether this is what was done; but once it is decided, as we *have* decided, that there was such payment, the argument about "full disclosure" collapses.

Perhaps this is a proper place to digress for the purpose of discussing where we differ with the trial court as to the liability of the various defendants.

As already pointed out, all who conspired and cooperated in the illegal sale are liable. The active parties in the preliminary negotiations and in the completion of the sale were John H. Alesch and R. A. Brown, a director of Iowa Mutual. Together with Brown, Carl J. Smith, Carman G. Smith, William Couch, and George S. Howes were the directors of Iowa Mutual who were managing its affairs and deciding its policy. As such, they must be held responsible for joining in the illegal purchase of Alesch, Inc. We agree with the trial court decree holding each of them liable.

This brings us to the remaining Iowa Mutual directors—the outside directors. An outside director is usually defined as one who is neither an officer nor an employee of the corporation. Cohen and Loeb, *Duties and Responsibilities of Outside Directors,* 44 (1978). There are some exceptions where, because of special knowledge or experience, a person should not be classified as an outside director. These may include legal counsel, the corporation's banker, retired executives of the corporation, or representatives of major corporate suppliers or customers. *See* Knepper, *Liability of Corporate Officers and Directors,* 25 (3d ed. 1978).

With these exceptions, an outside director does not have the same duty or responsibility that falls upon those who are in active charge and who dictate day-to-day policy.

This statement appears in Knepper, § 1.11, 26–27:

An outside director's independence should be his most distinguishing characteristic. Such independence does not require an outside director to take an adversary attitude toward management, to characteristically dissent from management proposals, or to assume without truth that management is not dealing in good faith. An outside director should be vigilant and questioning in an effort to learn what is in the corporation's best interest. He is expected to exercise "a healthy skepticism" and an alertness to possible wrongdoing on the part of corporate insiders . . .

Although independent outside directors should undertake active and vigorous scrutiny of corporate activities, they should not attempt to run the corporation or arbitrarily to substitute their judgment for that management.

We quote this from 31 Bus.Law. 1799, 1805 (July 1976):

There are at least two dangers inherent in the monitoring role [to be played by the outside director]. First, it is tempting for outside directors with monitoring responsibilities to try to review operating decisions by substituting their own judgment for that of management. However, outside directors should resist being drawn into thinking that they are running the corporation. For this reason, great care must be taken with respect to proposals that the outside directors be given a private staff to collect information and to help analyze management decisions . . . Second, the creation of a monitoring responsibility may lead outside directors to believe that their role requires them to assume an essentially adversary attitude toward management. If that were true, many valuable directors would be dissuaded from serving. However, in terms of attitude, all that the monitoring function implies is a willingness to be vigilant and questioning in the effort to determine what is in the best interest of the corporation.

This same thought is expressed as follows by the American Bar Association Committee on corporate law:

Before the advent of this so-called "outside" director, it was not unreasonable to expect the board to be actively involved in the corporation's business; however, with the development of board participation by individuals not otherwise actively involved with the corporation, any such expectation can no longer be viewed to be reasonable. Indeed, such involvement is clearly neither practical nor feasible insofar as today's complex corporation . . . is concerned.

(Committee on Corporate Law of the American Bar Association, Model Business Corporation Act with Revisions through 1974, Addendum B, p. 143).

On this subject generally *see Briggs v. Spaulding,* 141 U.S. 132, 137, 11 S.Ct. 924, 929, 35 L.Ed. 662, 676–77 (1891); *Escott v. BarChris Construction Corp.,* 283 F.Supp. 643, 687–89 (S.D.N.Y.1968).

■ The duty of the outside director must be determined upon the facts of each case. In this connection, it must be borne in mind that this is not an action by Iowa Mutual against its outside directors for their failure to give proper attention to its own affairs; it is an action charging the outside directors of Iowa Mutual with misconduct toward a third party. We do not say directors have no duty except to their own corporation. Nevertheless that must be their prime concern. The trial court found, and we agree, that the real facts were not disclosed to these outside directors. It is obvious, therefore, they could not have actively participated in the plan to take over Le Mars. Their liability, if they are to be liable, must be because they neglected to carry out their general duties as directors.

■ Thus we must view the conduct of these defendants in the light of the general principles discussed above. They could not abdicate their duty nor "close their eyes" to the conduct of corporate affairs. *Harman v. Willbern,* 374 F.Supp. 1149, 1157, aff'd. 520 F.2d 1333 (10th Cir. 1975); *Heit v. Bixby,* 276 F.Supp. 217, 231 (S.D.Mo.1967).

■ On the other hand, outside directors should not take a position adversary to management. Neither should they attempt to substitute their judgment for that of those in active control of decision making. At least until they have reason to suspect impropriety, they may within reasonable limits rely on those who have primary responsibility for the corporate business.

The balancing of these factors must be on a case-by-case basis, depending upon the circumstances at the time the challenged action was taken.

■ We find no circumstances to arouse the suspicion of the outside directors. They had learned to rely on the management skill and judgment of the officers and executive committee. There had been no previous deception in their dealings with the directors. The record shows they had confidence in the business judgment of these men as well as in their integrity. We cannot say these directors should have viewed this transaction with suspicion and cynicism. Plaintiffs argue they should have been alerted by the substantial purchase price. However, that is pure hindsight. They were told this was an advantageous deal, as indeed it was for Iowa Mutual. The question is whether they had a duty to make an independent investigation concerning Alesch, Inc. valuation. We hold they did not.

While not controlling or directly in point, *Proksch v. Bettendorf,* 218 Iowa 1376, 1379–81, 257 N.W. 383, 384–85 (1934); *Cornick v. Weir,* 212 Iowa 715, 722–30, 237 N.W. 245, 248–51 (1931) contain interesting comments concerning the obligation of directors to those dealing with the corporation as contrasted to their higher duty to the corporation itself.

We conclude the four outside directors of Iowa Mutual—Wilkinson, Judge, Molyneaux, and Rutenbeck—neither participated in the scheme by which control of Le Mars was wrongfully obtained nor did they violate their duty as directors of Iowa Mutual. We hold they have no liability to plaintiffs or to Le Mars. We have not overlooked the fact that one of these outside directors—John R. Wilkinson—was named as a director of Le Mars when Iowa Mutual designated its nominees to replace the directors who had resigned to accommodate Mr. Alesch. However, this does not alter our conclusion on this issue.

■ The circumstances concerning the Le Mars directors are entirely different. In the first place Le Mars is the real complaining party, the one victimized by the wrong. It had a right to expect its directors to be

more vigilant in protecting it. Unlike Iowa Mutual's outside directors, these men were faced with questionable conduct directly affecting their own corporation. There were circumstances which should have clearly signalled a duty to inquire and investigate. The principal one was the request for en masse resignations, prepared and submitted for their signatures, as part of the overall plan by which John H. Alesch was retiring from Le Mars and at the same time selling his agency. We find these directors failed to discharge their duties as directors when even the most ordinary diligence on their part would have prevented the surrender of their corporation to Iowa Mutual. They cannot escape the consequences of this neglect of their fiduciary duty. *Des Moines Bank & Trust Co. v. Bechtel & Co.,* 243 Iowa at 1081, 51 N.W.2d at 216; Knepper, *Liability of Corporate Officers and Directors,* §§ 1.03–1.05, 5–12 (3d ed. 1978). We affirm the trial court in holding them liable.

We affirm, too, the trial court's finding of liability against Alice Alesch, both individually and as Executor of the Estate of John H. Alesch, deceased. The liability of Margaret A. Sevenich, Mary Kay Buffington, and Jane M. Warnick was limited to the amounts they received from Iowa Mutual for their stock in Alesch, Inc. over and above its actual value. That part of the decree is also affirmed.

This leaves only the question of Burton Dull's liability, which requires separate discussion.

X. *Liability of Burton Dull.*

We have deferred consideration of the liability of Burton Dull, attorney for Le Mars, until last because his status is unique and presents problems unlike those of the other defendants.

Dull became a director of Le Mars at the fateful April 21, 1970 meeting of Le Mars' policyholders. Until then, although he had represented Le Mars for many years, he had never attended a meeting of its board of directors. The trial court held him liable under a general finding that the "incoming directors of Le Mars" owed that corporation a fiduciary duty which he, along with others, had violated. We agree that Dull must share responsibility for the illegal sale of control of Le Mars, but we do not base that conclusion on his duty as an "incoming director" of the corporation.

■ We have already pointed out all who assist or cooperate in the breach of fiduciary duties—whether directors or not—are liable for the resulting damage. This is particularly true of one who acted as attorney. His duty is to the entire body of shareholders, or, in this case, policyholders. His obligation, indeed, is similar to, if not identical with, that of a director. 30 Bus. Law. 41, 59–60 (1975).

Relating this principle to the case at hand, we find Dull actively assisted and cooperated in accomplishing the illegal sale of control of Le Mars to Iowa Mutual. He must be held liable for that conduct.

■ Before discussing the evidence bearing on Dull's liability, we put to rest one circumstance he relies on to show his good faith and to negate liability on his part. He insists he made full disclosure to the insurance commissioner and secured his approval of the Alesch, Inc.—Iowa Mutual transaction. We do not believe the record bears him out on this, but even if it did, such disclosure and resulting approval would not save him. *See* our decision in the first appeal of this case, *Rowen v. Le Mars Mutual Insurance Co. of Iowa,* 230 N.W.2d at 911. *See also Dogle v. Union Insurance Co.,* 277 N.W.2d at 40–41.

Mr. Dull testified he knew it was illegal to sell a corporate directorship; but he further testified "that isn't what happened." We have already decided that *is* what happened, but we nevertheless consider Mr. Dull's testimony in the light of his insistence it did not.

Much of this defense depends on Dull's testimony he assumed the value of Alesch, Inc. stock was $500,000.00. Further, he says he was justified in reaching this conclusion from representations made by John H. Alesch, whom he had no reason to doubt. He asserts he had no duty to make an

independent investigation or appraisal to determine the actual value of the stock. He concludes from the above there was nothing to make the deal suspect and that there was no reason for him to explain the circumstances of the proposed sale to the Le Mars' board. We are unable to agree with this proffered defense.

It is true plaintiffs' whole case depends upon the payment of an amount in excess of the actual value of Alesch, Inc. stock for the purpose of buying the resignation of Le Mars' directors. It is equally true Dull would not be liable unless he assisted or cooperated in bringing this illegal plan to fruition.

Although he minimizes the part he played, Dull was active from the very beginning in the negotiations leading up to the sale of Alesch, Inc. He attended meetings with Employers Mutual of Des Moines before Iowa Mutual entered the picture. When the Employers Mutual proposal fell through, Dull continued to play a role as the Iowa Mutual offer developed. It is interesting to note that Dull insists he represented only Le Mars, but nevertheless he was zealously engaged in the on-going discussions dealing with the sale of Alesch, Inc. to Iowa Mutual.

Despite claims to the contrary, the circumstances strongly suggest Dull not only represented Le Mars during this period but also Alesch and Alesch, Inc. He attended a number of conferences, exchanged letters with Iowa Mutual, and prepared at least some of the instruments necessary to complete the sale. He says he attended the conferences only as a "bystander" and that he had no "input." However, the facts belie this. His attendance at the meetings, during which he made notes and, in some cases, followed up with letters or telephone calls confirming what had occurred are not the actions of a "bystander." He prepared the controversial contract between Iowa Mutual and Alesch, Inc.—neither one, he says, his client—and several related contracts. He admits, too, Alesch gave him $2,500.00 after the deal was completed for what he had done "down through the

years" without being paid. We find it hard to believe he was not representing the Alesch interests as well as Le Mars.

This question of dual representation in a matter involving such potential conflict of interest is important to our consideration. Even that doesn't tell the whole story. At the same time, Dull knew he was being slated by Iowa Mutual to become a Le Mars director. It is apparent Mr. Dull's loyalty was spread pretty thin.

We are unable to accept Dull's insistence that he was unaware any consideration was paid for the en masse resignations of Le Mars' directors. This goes back to his claim he relied on the representations of John H. Alesch, a practice born of experience over many years.

We reject the claim Dull did not know the real nature of the Iowa Mutual—Alesch, Inc. sale. He knew the deal was contingent on the resignation of Le Mars' directors. He knew, we believe, that the purchase price substantially exceeded the value of the stock. He knew of the unprecedented (according to witnesses) action in awarding pensions to the retiring directors, apparently to speed them on their way. He knew of the favorable management and consultant contracts awarded to Alesch and Alesch, Inc. by Le Mars.

The parties devote much of their argument to Mr. Dull's duty to fully advise the Le Mars board of the details of the transaction by which Iowa Mutual was to take over control. Dull says, first, that the board knew the full details; and, second, he believed John H. Alesch had informed the board of the circumstances.

This gets us back again to the fundamental factual dispute: was there a premium paid for control of Le Mars? If, as we have decided, there was, Dull's argument vividly illustrates the impasse he now faces. He says he justifiably assumed Alesch would make full explanation to the board. Yet Dull must know that if he *had,* the transaction would have been even more palpably illegal, for then the directors would have had actual knowledge of the illegality.

The most damaging single bit of evidence against him is the hotly disputed "recoupment" letter to R. A. Brown of Iowa Mutual. In that letter Dull referred to the management contract under which Le Mars was to pay Alesch, Inc. $2,500.00 per month (later one per cent of Le Mars' gross) as "management fees" as the means by which Iowa Mutual would "recoup" its investment in Alesch, Inc. Dull admits this letter, taken at face value, is damaging to his defense. He says the choice of words was unfortunate, but insists the real meaning, which both he and Brown understood, was that Le Mars should pay only a reasonable amount for management services actually rendered.

We are unable to put any construction on this letter except what we believe it clearly says—that Iowa Mutual was to get back its payment for Alesch, Inc. stock by the simple expedient of having Le Mars (which it controlled) pay "management fees" to Alesch, Inc. (which it owned). Thus Le Mars, not Iowa Mutual, would really be paying for the Alesch, Inc. stock.

More than any other evidence, this clearly shows not only Iowa Mutual's scheme to redeem the purchase price but also demonstrates Dull's knowledge that this was being done.

We conclude Burton Dull was active in assisting John H. Alesch and others in accomplishing the illegal sale of control of Le Mars. We accordingly affirm the trial court decree holding him liable to plaintiffs.

XI. *Relief Granted by Trial Court Decree.*

We now reach the equally disputed issues arising from the relief granted by the trial court. They may be listed in the following categories:

(1) Appointment of Special Master.

(2) Transfer of all corporate stock of Alesch, Inc. from Iowa Mutual to Le Mars.

(3) "Separation" of Iowa Mutual and Le Mars with court appointment of interim directors for Le Mars and court supervision of election of new Board of Directors.

(4) Court appointment of interim directors for Alesch, Inc. and supervision of election of new Board.

(5) Various areas of damage assessment.

Before discussing them individually, we point out some general principles applicable to our consideration.

Defendants object that much of the relief granted is unwarranted and without precedent. However, we have recently been willing in several cases to adopt extraordinary measures to meet extraordinary circumstances. *Holi-Rest, Inc. v. Treloar,* 217 N.W.2d at 526–27; *Holden v. Construction Machinery Co.,* 202 N.W.2d at 363–64.

We mention parenthetically that a money award in a derivative suit is more appropriately referred to as a judgment for restitution rather than as one for damages. *Holden v. Construction Machinery Co.,* 202 N.W.2d at 358. However, the cases do not always recognize this distinction, and neither did the trial court in the present case. In this opinion we use the terms interchangeably.

In discussing the power of an equity court to tailor relief to fit the case, we said in *Holden,* 202 N.W.2d at 363–64:

In resisting this decree defendants assert there is no precedent for [the relief granted]. We find that argument nonpersuasive.

"Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before." McClintock on Equity, § 29 at 76 (2d ed. 1948). See also *State ex rel. Weede v. Bechtel,* 239 Iowa 1298, 1313, 31 N.W.2d 853 (1948); *Whitaker & Co. v. Sewer Improvement District No. 1,* 229 Ark. 697, 318 S.W.2d 831, 835 (1958); *Tull v. Turek,* 38 Del.Ch. 182, 147 A.2d 658, 664 (1958); *Patton v. Nicholas,* 154 Tex. 385, 279 S.W.2d 848, 857 (1955); *Southwest Virginia Hospitals, Inc. v. Lipps,* 193 Va. 191, 68 S.E.2d 82, 94 (1951); 1959 Duke L.J. 436, 441.

This applies particularly to the appointment of a special master under rules 207–214, Iowa R.Civ.P.

Defendants vigorously oppose the appointment of a special master and claim that course is unnecessary. They point out—correctly—that the trial court announced prior to trial it expected proceedings to be final and plenary to avoid any occasion for re-trial of "this troublesome and expensive litigation."

Several things must be remembered in this connection. This appeal is interlocutory and the case is not yet completely closed. Furthermore, the most laudable judicial objectives are sometimes unattainable. This is an instance in which the case did not lend itself to a complete determination of all evidentiary matters. We approve the appointment of a special master as permitted by rule 207. In the absence of such a provision, it is not unlikely we would have ordered a similar procedure on remand. We discuss later the expanded powers which we delegate to the special master.

We also uphold the trial court's exercise of jurisdiction over the interim appointment of directors and its supervision, later, of the election of a new board of directors. This applies to both Le Mars and Alesch, Inc. Courts traditionally adopt a hands-off policy in regard to the conduct of corporate affairs. *Des Moines Bank & Trust Co. v. Bechtel & Co.*, 243 Iowa at 1067, 51 N.W.2d at 208–09. However, when an equitable result can be obtained in no other way, this rule must give way. *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d at 526–27; *Holden v. Construction Machinery Co.*, 202 N.W.2d at 363–64.

In considering the relief granted, the overriding principle is that the rules applied are equitable in nature, that no one of them is inflexible, and that the issues must be decided on a case-by-case basis. In both *Holi-Rest* and *Holden* we held equity would fashion unusual relief to meet unusual circumstances. Other decisions reaching similar results include *Richardson v. Blue Grass Mining Co.*, 29 F.Supp. 658, 670 (E.D.Ky.

1939), *aff'd.* 127 F.2d 291 (6th Cir.), cert. denied 317 U.S. 639, 63 S.Ct. 30, 87 L.Ed. 515 (1942); *Ohio Drill & Tool Co. v. Johnson*, 498 F.2d 186, 191 (6th Cir. 1974); *American Timber & Trading Co. v. Niedermeyer*, 276 Or. 1135, 558 P.2d 1211, 1233 (1976); *Lydia E. Pinkham Medicine Co. v. Gove*, 303 Mass. 1, 20 N.E.2d 482, 486 (1939).

We believe this case calls for fashioning the remedy to fit the facts. The absolute control of all three involved corporations—Le Mars, Iowa Mutual, and Alesch, Inc.—by the same persons who have been found liable for the dealings which made such control possible make it mandatory to establish procedures by which Le Mars and Alesch, Inc. may be governed by independent boards properly chosen. We affirm that part of the decree ordering the "separation" of Iowa Mutual and Le Mars and providing for the appointment of interim directors until the election of directors under supervision of the trial court.

The trial court decree calls for repayment to Le Mars of "management fees and expenses paid by Le Mars to Iowa Mutual or Alesch Agency since April 1970" and for "gross receipts of Alesch Agency since April 1970."

We disagree with both these findings. Restitution is an equitable doctrine and is to be applied according to the facts of each case. We agree all profits must be accounted for and all benefit to the individuals must be returned. But there is nothing equitable about denying defendants the benefit of the actual and reasonable cost of producing that profit.

In regard to this provision, the trial court added the following comment:

It is true that the return of [some of] these amounts to Le Mars Mutual will constitute a windfall to the extent that management services were actually received or more than customary profit is generated thereby. On the other hand, Iowa Mutual and the defendants will certainly benefit to the extent that any funds from Le Mars Mutual or Alesch Agency are retained, whether such funds

represent "profit" or "cost." This Court resolves the issue in favor of the victim and not the wrongdoer. Management charges to Le Mars Mutual and gross receipts of Alesch Agency after April 21, 1970 are returnable to Le Mars Mutual without inquiry as to fairness or reasonableness.

The trial court thus applied the "no inquiry" rule to all payments made after April, 1970, no matter what their purpose without regard to either the necessity of the services or the reasonableness of the amount charged. Plaintiffs urge us to adopt this same rule. We decline to do so.

The no-inquiry rule is ordinarily applied to the transaction itself where there has been a breach of fiduciary duty. It provides the illegal sale or contract is unenforceable, without regard to fairness or reasonableness. It also deprives the wrongdoer of all benefit or profit from the transaction. However, there is no persuasive authority which denies him, too, reimbursement for legitimate expenses incurred. We find the result reached unduly harsh and singularly inequitable in favor of plaintiffs, who have been most insistent on fairness and equity when seeking relief for themselves. Those same standards should be applied for defendants as well as against them.

A number of cases have considered similar problems. Our own case of *Des Moines Bank & Trust Co. v. Bechtel & Co.*, 243 Iowa at 1049, 51 N.W.2d at 199, holds the "net profits" must be accounted for. The *Ohio Drill* case (498 F.2d at 190) requires that all profits be "disgorged" but notes that there must first *be* profits. In *American Timber* (558 P.2d at 1223) the court pointed out the doctrine of restitution is an equitable one and that, far from being inflexible, it must be applied as the particular facts dictate. The same view was announced in *Lawson v. Baltimore Paint & Chemical Corp.*, 347 F.Supp. 967, 977 (D.Md. 1972), where the court said that a director who had breached his fiduciary duty may nevertheless sometimes be entitled to salary or other compensation.

Even *Borden v. Sinskey*, 530 F.2d 478, 497–98 (3d Cir. 1976), the case plaintiffs characterize as "the most important single case [in this area] in decades" does not go as far as the trial court did. *Borden* denied all profit and benefit to the individual wrongdoers but it permitted credit for $430,000.00 of expenses.

We have not overlooked the fact that the trial court disallowed such items on two grounds—first, the philosophical one we have just rejected and, second, because of defendants' failure to "demonstrate the cost and profit components of the charges made to Le Mars Mutual for Management Services."

We doubt the record bears this out; but we do not base our decision on any such close call as to burden of proof. We prefer, rather, to accord defendants the same privilege which has been given plaintiffs to supplement their proof as to management fees and expenses paid by Le Mars to Iowa Mutual or to Alesch Agency since 1970 and to make findings also concerning the net as well as the gross receipts of Alesch Agency since April, 1970, so that the trial court, when such findings are submitted together with the special master's recommendations, may determine the true amount to be reimbursed for these items.

XII. *The Actual Value of Alesch, Inc. Stock.*

Of vital importance in deciding if a premium was paid for Alesch, Inc. stock is a determination of what the value of the stock was at the time of the sale. The total purchase price was $516,176.16 of which $116,176.16 represented liquid assets consisting of stocks, bonds, cash, and guaranteed accounts. The remaining $400,000.00 was for the outstanding stock of the corporation. Plaintiffs argue this was a gross overpayment which can be explained in no other way except by attributing it to a premium for Mr. Alesch for delivery to Iowa Mutual of control of Le Mars. Defendants, on the other hand, insist this was the fair value of the stock.

■ All parties agree that directorships in a corporation are not for sale and that a contract for that purpose is illegal and unenforceable. Our task is to decide if the Le Mars' directors renounced their positions as directors in return for financial gain. The fact that the financial gain may have gone to John H. Alesch instead of to them individually would not save the contract.

■ Directors may resign at any time and for any reason if they act in good faith and without personal gain. *Modern Heat & Power Co. v. Bishop Steamotor Corp.*, 239 Iowa 1267, 1273, 34 N.W.2d 581, 585 (1948); *Goode v. Powers*, 97 Ariz. 75, 397 P.2d 56, 59–60 (1964); *Raines v. Toney*, 313 S.W.2d at 809; *Gerdes v. Reynolds*, 28 N.Y.S.2d 622, 649 (S.Ct.1941); *Insuranshares Corporation v. Northern Fiscal Corp.*, 35 F.Supp. 22 (E.D.Pa.1940); *McClure v. Law*, 55 N.E. at 389.

If, as defendants claim, the directors resigned without financial considerations as an inducement and only because they no longer wanted to serve, they could have done so without incurring liability. However, we do not believe that is what happened.

Under this record, the value of Alesch, Inc. stock could vary from one to three times the annual premiums. This was established by witnesses whose qualifications the defendants vigorously contest but who gave testimony which we deemed to be credible and entitled to consideration. The annual premium figure used by the witnesses (about which there was little, if any, dispute) was $37,000.00. Under this formula the value would lie somewhere between $37,000.00 and $111,000.00.

The amount paid by Iowa Mutual is grossly in excess of even the highest figure. In addition, the testimony shows that the value of Alesch, Inc. would be greatly enhanced with control of Le Mars Mutual. One witness in fact—the former insurance commissioner of the state—testified that without such control Alesch, Inc. stock would be "worthless".

We have not overlooked defendants' testimony concerning value. Their witness, David A. Bakst, stated that in his opinion the amount paid for the corporation was not excessive and that there were "other factors" to be taken into consideration in addition to the annual premium formula, although he conceded that this was one way in which insurance agencies are commonly valued for sale purposes.

As far as this record is concerned, we believe the only other factor was the control of Le Mars, and we believe, too, that the evidence confirms the trial court's finding that Iowa Mutual paid a sum substantially greater than the value of Alesch, Inc. as a premium in return for Mr. Alesch's delivery of control of the board of directors of Le Mars Mutual.

■ We find, however, that the actual value of Alesch, Inc. arrived at by the trial court is low. The trial court fixed the value at $50,000.00 (over and above the liquid assets). We recognize that it is impossible to decide under this record the exact value of the agency, but we find it is more than $50,000.00. Using the $37,000.00 annual premium figure, we set the value of the stock at two-and-one-half times that amount or $92,500.00. Certainly a sale for that amount could not have been held excessive.

This, of course, reduces the amount of the premium paid by Iowa Mutual for control of Le Mars but it does not change the result. The trial court found the amount paid for the stock was $400,000.00 and the actual value was $50,000.00. It fixed the illegal premium at $350,000.00. By increasing the value of the stock to $92,500.00, we reduce the amount of the premium to $307,500.00.

This is the amount for which Le Mars must be reimbursed. *Rosenfeld v. Black*, 445 F.2d at 1350; *Moulton v. Field*, 179 F. 673, 675 (7th Cir. 1910); *Gordon v. Fundamental Investors, Inc.*, 362 F.Supp. 41, 45 (S.D.N.Y.1973); *Perlman v. Feldmann*, 219 F.2d at 178; *Porter v. Healy*, 244 Pa. 427, 91 A. 428, 431 (1914); *McClure v. Law*, 55 N.E. at 389.

## XIII. Transfer of Alesch, Inc. stock to Le Mars.

The trial court decree directed Iowa Mutual by proper corporate resolution to transfer all of the outstanding stock of Alesch, Inc. to Le Mars. This, of course, is the stock whose purchase triggered this litigation.

We quote from the decree:

The failure to offer Alesch Agency to Le Mars Mutual was a breach of fiduciary duty by John H. Alesch in which Iowa Mutual and the above-indicated defendants joined and participated. Accordingly, Iowa Mutual shall, by appropriate corporate resolution, cause the entire outstanding stock of Alesch Agency to be conveyed to Le Mars Mutual forthwith.

■ Plaintiffs had pled and argued the doctrine of corporate opportunity. Perhaps the leading case on corporate opportunity is *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503 (1939). It announced the rule that one holding a corporate fiduciary position may not appropriate for himself a business opportunity which in fairness belongs to the corporation. We have adopted this rule. *Schildberg Rock Products Co. v. Brooks*, 258 Iowa 759, 766–67, 140 N.W.2d 132, 137 (1966).

In *Schildberg* we quoted the following from the *Guth* case with approval:

* * * [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of

the corporation upon the property, interests and profits so acquired.

The authorities universally hold the corporate opportunity rule is simply one phase of a director's duty of loyalty. *Schildberg Rock Products Co. v. Brooks*, 258 Iowa at 768, 140 N.W.2d at 137; *Miller v. Miller*, 301 Minn. 207, 222 N.W.2d 71, 78 (Minn.1974); *Kerrigan v. Unity Savings Ass'n*, 11 Ill. App.3d 766, 297 N.E.2d 699, 704–05 (1973), *modified*, 58 Ill.2d 20, 317 N.E.2d 39 (1974); *Raines v. Toney*, 313 S.W.2d at 808–09; *General Automotive Manufacturing Co. v. Singer*, 19 Wis.2d 528, 120 N.W.2d 659, 663 (1963); 19 Am.Jur.2d *Corporations* § 1311, at 717 (1965); 26 Fordham Law Review 528 (1957); J. Slaughter, "The Corporate Opportunity Doctrine," 18 Southwestern Law Journal 96 (1964); D. Walker, "Legal Handles Used to Open or Close the Corporate Opportunity Door," 56 Northwestern Law Review 608 (1961).

This case does not fit the usual pattern of corporate opportunity cases. Invariably they involve the wrongful *acquisition* of a business or other property which rightfully belongs to the corporation. Here we have a *sale* by a director of a business which the corporation had a right to expect would be offered to it.

Apparently plaintiffs recognized this because they argue the corporate opportunity arose as early as 1950, when Alesch first acquired an interest in the agency. We reject that theory. The trial court, too, was reluctant to apply the corporate opportunity doctrine to this transaction, preferring to rely on the general rule of loyalty and fidelity which a director owes his corporation.

■ Like the trial court we decline to rely on the doctrine of corporate opportunity as a separate basis for the result we reach. We do, however, say that the studied and deliberate refusal to afford Le Mars an opportunity to acquire Alesch, Inc. was an act of disloyalty and a violation of John H. Alesch's fiduciary duty. It can be explained only by his intention to achieve personal financial gain by the bold sale of

corporate directorships. We have already discussed this in Division IX and need add nothing more.

We agree with the trial court that the sale of Alesch, Inc. to Iowa Mutual cannot stand. It must be set aside in favor of Le Mars. We affirm that part of the decree which directs Iowa Mutual to transfer all of the outstanding stock of Alesch, Inc. to Le Mars.

However, Le Mars should pay Iowa Mutual the actual value of the stock, which we have fixed in Division XII at $92,500.00. In the adjustment of the accounts to be made by the special master, Iowa Mutual shall be given credit for $92,500.00 upon transfer of the stock to Le Mars. *See Gabriel Industries, Inc. v. Defiance Industries, Inc.*, 22 N.Y.2d 405, 293 N.Y.S.2d 65, 66, 239 N.E.2d 706, 707 (1968).

XIV. *Punitive Damages.*

The trial court, while reserving the amount of restitution to be made, nevertheless fixed the dollar amount of punitive damages to be paid.

 Punitive damages may ordinarily be exacted only from those who are first liable for compensatory damages. *Young v. City of Des Moines*, 262 N.W.2d 612, 620 (Iowa 1978); *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d at 524. *But see Holden v. Construction Machinery Co.*, 202 N.W.2d at 359. In the present case the trial court determined those who are liable, even though the specific amount to be recovered remains for future determination. This was sufficient basis for fixing punitive damages.

The trial court did not assess punitive damages against Alice W. Alesch, Wilhelmine K. Tappan, Margaret A. Sevenich, Mary Kay Buffington, Jane M. Warnock, John C. Howes, Alyce M. Breese, Executor of Estate of John Breese, deceased, Alesch, Inc., or Alice W. Alesch, Executor of the Estate of John H. Alesch, deceased.

 It is ironic that no punitive damages can be collected from Alesch, Inc. or from John H. Alesch. Of course, it would be idle to assess them against Alesch, Inc. since under the decree it becomes the property of Le Mars anyway. John H. Alesch (or his estate) is not subject to punitive damages because such an award is not made against one deceased. *Wolder v. Rahm*, 249 N.W.2d 630, 632 (Iowa 1977).

We do not understand any serious objection is made to the disallowance of punitive damages against the defendants listed above. In any event we agree with the trial court's findings.

This leaves for consideration the punitive damage awards against the remaining defendants as follows:

| | |
|---|---|
| Iowa Mutual Insurance Company of DeWitt: | $2,000,000.00 |
| M. H. Gearke: | $ 1,000.00 |
| John M. Vollmar: | $ 3,000.00 |
| P. G. Vander Meer: | $ 3,000.00 |
| Clyde Eastman: | $ 3,000.00 |
| Burton Dull: | $ 25,000.00 |
| Carl J. Smith: | $ 25,000.00 |
| Carman G. Smith: | $ 25,000.00 |
| R. A. Brown: | $ 25,000.00 |
| William Couch: | $ 25,000.00 |
| George S. Howes: | $ 25,000.00 |
| John R. Wilkinson: | $ 3,000.00 |
| J. Ray Judge: | $ 3,000.00 |
| D. M. Molyneaux: | $ 3,000.00 |
| W. L. Rutenbeck: | $ 3,000.00 |

For reasons already stated in Division IX we disallow the punitive damage awards against John R. Wilkinson, J. Ray Judge, D. M. Molyneaux, and W. L. Rutenbeck, the outside directors of Iowa Mutual.

 In considering punitive damages, it is fundamental that they are not allowed as a matter of right. Such damages are always discretionary. *Young v. City of Des Moines*, 262 N.W.2d at 620; *Katko v. Briney*, 183 N.W.2d 657, 662 (Iowa 1971). In proper cases they are allowed as both a punishment to the wrongdoer and a deterrent to others. Most courts do not allow punitive damages in derivative actions, but we have adopted a contrary rule. *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d at 525–26; *Holden v. Construction Machinery Co.*, 202 N.W.2d at 359.

First we take up the allowance of punitive damages against Iowa Mutual in the

amount of two million dollars. We do not believe such an assessment, or any assessment, of punitive damages should stand.

Plaintiffs rely heavily on our recent decision in *Young v. City of Des Moines,* 262 N.W.2d at 620. However, that case does no more than announce the rule that punitive damages may be awarded against a municipal corporation—something theretofore prohibited—under proper circumstances. Apparently plaintiffs read more into *Young* than we put there.

■ In this derivative action any recovery by plaintiffs inures to the benefit of Le Mars Mutual. That corporation then will fall heir to any punitive damages paid by Iowa Mutual. The loss will fall on the *innocent* policyholders of Iowa Mutual; the benefit will accrue to the *innocent* policyholders of Le Mars Mutual. We believe this leads to an inequitable result because of the nature of mutual insurance companies, which have no stockholders. The policyholders, who necessarily are numerous and scattered, traditionally take no part in the management of the company. *Moulton v. Field,* 179 F. at 675.

This, of course, is equally true of both Le Mars and Iowa Mutual. In each case the policyholders are innocent of any wrongdoing. Yet each, through its directors, is guilty of virtually the same improprieties. Iowa Mutual improperly bought control of Le Mars; Le Mars improperly permitted this to occur.

As already stated, punitive damages serve two main purposes—to punish and to deter. We see no legitimate purpose to be served in penalizing one group of innocent policyholders and rewarding another for equally culpable conduct. In this equity case, we find that to be singularly inequitable. We find, too, an assessment of punitive damages against Iowa Mutual would not serve the purposes such damages are designed to serve. It might be argued Iowa Mutual would be both punished and deterred; but an equity court must balance this against the concurrent fact that Le Mars would receive a two-million-dollar reward for identical misconduct. We con-

clude the award of punitive damages against Iowa Mutual must be, and it is, set aside.

■ We agree with the trial court that punitive damages are proper against the remaining individual defendants. Each was guilty of violating his fiduciary duty or of cooperating with those who did. Their conduct was deliberately designed to wrongfully obtain control of Le Mars. Under our holdings in *Holden,* 202 N.W.2d at 359, and in *Charles v. Epperson & Co., Inc.,* 258 Iowa 409, 137 N.W.2d 605 (1965), punitive damages were properly assessed.

The rationale we used in denying punitive damages against Le Mars loses its force when dealing with the punitive awards against the individual defendants. Their liability rests on their personal misconduct. In their cases, punitive damages will indeed punish and will indeed deter. The fact that Le Mars is the fortuitous recipient of the damages does not outweigh the beneficial effect of the awards against the individuals.

■ Except as modified, we affirm the allowance or disallowance, as the case may be, of punitive damages against the defendants. Defendants claim they are excessive; plaintiffs decry them as parsimonious. We find them to be large enough to "smart," but not in any way unreasonable in view of the net worth of the parties as shown by the record.

## XV. *Restitution.*

The trial court ordered restitution in ten separate categories in amounts to be determined by the special master subject to approval of the court. We have already discussed and disposed of some of these—punitive damages, management fees and expenses, and Alesch, Inc. receipts since April, 1970.

■ We now rule on the remaining specific matters relating to restitution. Le Mars is entitled to reimbursement for the following:

(1) The overpayment or premium for Alesch, Inc. stock which we have fixed in the amount of $307,500.

(2) All pensions for Le Mars' directors (except the pension to M. H. Tappan authorized on January 17, 1967). This specifically includes any pensions granted or increased by the Le Mars board of directors at its December 2, 1969, meeting, which we hold were made in contemplation of the illegal transfer of control.

(3) All salaries paid to John H. Alesch and Alice Alesch after April, 1970, by either Le Mars or Alesch, Inc.; and all automobile and office expense paid to them except to the extent, if any, that the special master finds such expenses necessary, proper, and reasonable for the operation of the business.

(4) All Le Mars' director fees and all salaries and director fees of Alesch, Inc.

(5) All attorney fees paid after April 21, 1970, to Burton Dull by Le Mars for services rendered in connection with, or arising out of, the sale of Alesch, Inc. and the subsequent take-over of Le Mars by Iowa Mutual.

(6) All legal fees and costs, if any, advanced by Le Mars for the defense of officers and directors in this action.

We summarize our holdings as follows:

(1) We affirm the trial court's finding of liability except as to defendants John R. Wilkinson, J. Ray Judge, W. L. Rutenbeck, and D. M. Molyneaux.

(2) We approve the appointment of a special master as modified in Division XI.

(3) We affirm the trial court's award of equitable relief as set out in Divisions XI, XII, and XIII.

(4) We affirm the provisions of the decree relating to reimbursement and restitution as modified in Division XV.

(5) We reverse as to punitive damages awarded against Iowa Mutual, John R. Wilkinson, J. Ray Judge, W. L. Rutenbeck, and D. M. Molyneaux. Otherwise we affirm the award of punitive damages.

(6) We remand the case to the district court for further proceedings.

(7) We dismiss the separate appeal of Le Mars for reasons stated in Division II.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. APPEAL OF LE MARS MUTUAL INSURANCE COMPANY OF IOWA DISMISSED.

All Justices concur except LARSON, J., who takes no part.

*Supplemental Opinion*

LeGRAND, Justice.

Our opinion in this case was filed on July 11, 1979. We file this supplemental opinion to clarify two matters decided there. One concerns the pension rights of John H. Alesch, deceased, and the other deals with the punitive damage award as it relates to the defendant, M. H. Tappan.

*John H. Alesch Pension*

Our opinion disallowed all pensions in favor of the directors of Le Mars Mutual Insurance Company except the pension granted to defendant, M. H. Tappan, on January 17, 1967. The pension granted to John H. Alesch on January 18, 1966, should also have been excepted from that portion of the opinion which invalidated pensions to the directors.

We now modify Division XV of our opinion of July 11, 1979, by deleting subparagraph (2) which provides Le Mars is entitled to reimbursement for:

(2) All pensions for Le Mars' directors (except the pension to M. H. Tappan authorized on January 27, 1967). This specifically includes any pensions granted or increased by the Le Mars board of directors at its December 2, 1969, meeting, which we hold were made in contemplation of the illegal transfer of control.

and substituting in lieu thereof the following:

(2) All pensions for Le Mars' directors (except the pension to M. H. Tappan authorized on January 17, 1967, and

the pension to John H. Alesch authorized on January 18, 1966). This specifically includes any pensions granted or increased by the Le Mars board of directors at its December 2, 1969, meeting, which we hold were made in contemplation of the illegal transfer of control.

*Punitive Damages Against M. H. Tappan*

The opinion of July 11, 1979, affirmed allowance of punitive damages as orderd by the trial court except as to Iowa Mutual Insurance Company of DeWitt, John R. Wilkinson, J. Ray Judge, D. M. Molyneaux, and W. L. Rutenbeck. Under this provision the trial court's award of punitive damages against M. H. Tappan was affirmed. However, elsewhere the opinion listed the remaining defendants, stating as to each the amount of punitive damages allowed by the trial court or that none was assessed. M. H. Tappan's name was inadvertently omitted from this list. For purposes of clarification we now specifically affirm the punitive damage award against M. H. Tappan in the amount of $10,000.00.

Except as modified herein, our original opinion is confirmed in all respects. The petition for rehearing filed by Alice Alesch, as administrator of the Estate of John H. Alesch, deceased, is denied.

All Justices concur in this supplemental opinion except LARSON, J., who takes no part.